Robert SHIMKUS, et al., Plaintiffs,

and

United States of America,
Plaintiff-Intervenor-Appellant,

v.

The GERSTEN COMPANIES, Sid Wald,
Buena Vista Apartments, Inc., et al.,
Defendants-Appellees.

No. 85–2594.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 10, 1986.

Decided May 6, 1987.

William Bradford Reynolds and Louise Lerner, Washington, D.C., for plaintiff-intervenor-appellant.

Alice M. Beasley, Henry Hewitt and John Erickson, San Francisco, Cal., Julius L. Chambers, Lowell Johnston and Judith Reed, New York City, for defendants-appellees.

Before WRIGHT, SNEED and KOZINSKI, Circuit Judges.

WRIGHT, Senior Circuit Judge:

This is an action to remedy housing discrimination under Title VIII of the Civil

Rights Act of 1968. 42 U.S.C. § 3601 *et seq.* (1982). The Act prohibits, *inter alia*, discrimination against any person on the basis of race, color, religion, sex, or national origin in the rental of housing. *Id.*

In this appeal we are confronted with a consent decree entered for private litigants that conflicts with a consent order previously entered for the government. Both judgments were intended to remedy the discrimination.

The question is whether the district court, in entering the private consent decree, erred in ignoring the rights of non-black minorities under Title VIII and, if so, what the proper remedy should be. We hold that these rights were ignored. The court should join the non-black minorities as additional parties and modify the consent decree to provide for their interests.

*FACTS*

In April 1983, Robert Shimkus filed a class action against the Gersten Companies, a property management business, claiming that Gersten violated, *inter alia*, Title VIII of the Civil Rights Act, 42 U.S.C. 3601 *et seq.*, by discriminating against blacks in selecting tenants at six of its apartment complexes. A week later, the United States also filed a discrimination suit against Gersten. The two cases were assigned to the same judge but were not consolidated.

The Shimkus class was composed only of blacks and did not include other minorities. The government did represent the interests of *all* minorities, black and non-black.[1]

In January 1984, the court entered a consent order between the government and Gersten. It enjoins Gersten from discriminating against any person on the basis of race, color, or national origin. It also identifies about 100 minority housing applicants who will receive priority status for the next available apartment units. Finally, it requires Gersten to (1) teach its employees their duties under the Federal Housing Act and the order; (2) publicize its non-discrimination policy in its advertising

and on stationery, forms, and pamphlets; (3) advertise its apartment vacancies in newspapers circulated in the local black community; and (4) notify certain fair housing authorities of its non-discrimination policy. The *Shimkus* plaintiffs were not parties to the order.

That order remained in effect without modification for 18 months and met with the approval of all parties.

In February 1985, the *Shimkus* plaintiffs and Gersten submitted a consent decree in the other case for court approval (the Shimkus Decree). The government, upon receiving notice of the proposed Decree, successfully moved to intervene and objected to some provisions. The district court rejected these contentions, approved the Shimkus Decree, and entered it as a final judgment on July 23, 1985.

The Decree enjoins six Gersten apartment complexes from discriminating against any black applicant on the basis of race and requires those developments to give black applicants preferential consideration for available apartments according to an affirmative action plan. The plan requires each development to achieve a percentage of black residency that reflects the percentage of black applicants.

Specifically, the plan requires Gersten to fill vacant apartment units with qualified black applicants at a rate equal to the percentage of blacks in the applicant pool, and to augment this rate by the lesser of (1) 15% of the total applicant pool, or (2) the percentage of black applicants. If, at one development, the percentage of black residents drops below the percentage of black applicants for a six-month period (where not excused for any of the three reasons listed below), that development will be required to increase correspondingly the number of black residents in the next six-month period.

This affirmative action plan is to last a maximum of four and a half years. It will be suspended if, at the end of any six-month period, the percentage of black tenants in a targeted development equals the

---

1. The government argues that, in addition to blacks, Gersten discriminated against East Indians, Afghans, Iranians, Indians, Pakistanis, Hispanics, and Asians generally.

percentage of blacks in that complex's applicant pool. If these ratios are maintained for a full year, the Shimkus Decree will be terminated for that complex. If the ratios are not maintained, the Decree will be reinstated.

These black residency requirements are not absolute. Notwithstanding the level of black residency at a targeted development, Gersten will be deemed in compliance with the Decree if (1) Gersten extends bona fide offers to the requisite number of black applicants; (2) there is a shortage of qualified black applicants;[2] or (3) the numbers of black applicants relative to available apartment units, or the requirements of federal housing subsidies, make it impossible to achieve the Decree's objectives.

The Shimkus Decree states explicitly that it supersedes the government order to the extent they conflict.

### STANDARD OF REVIEW

■ The court reviews the approval of a class action settlement for abuse of discretion. *Officers for Justice v. Civil Serv. Comm'n.*, 688 F.2d 615, 626 (9th Cir.1982), *cert. denied*, 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983). Modification of a consent decree is also reviewed for abuse of discretion. *United States v. Oregon*, 769 F.2d 1410, 1416 (9th Cir.1985).

### DISCUSSION

The government argues that the Shimkus Decree is improper because it conflicts with and, in effect, modifies the government order. The conflict lies in the Decree's affirmative action housing plan. It essentially requires Gersten to grant any available apartment units to qualified blacks until the targets are reached. But it does not impose upon Gersten similar requirements as to non-black minorities. Therefore, the government contends, the plan grants plaintiffs preferential relief at the expense of non-black minorities and others covered by the government order. Black applicants may displace non-black minorities who were also discriminated against by Gersten, if necessary to meet the plan's black residency targets. The government order, by contrast, provides relief for *all* minorities.

■ Because the Shimkus Decree supersedes the government order to the extent they conflict, the government order is effectively modified. This modification, says the government, is unnecessary and improper.

We disagree that it is improper. When the government brings a discrimination action against a party resulting in a consent order, private parties, not in privity with the order, are not bound by its terms and may bring their own suit against the defendant. *See Bratton v. Bethlehem Steel*, 649 F.2d 658 (9th Cir.1980). "To hold otherwise would for all practical purposes foreclose a private right of action whenever the [government] has already concluded enforcement activities." *Id.* at 669; *see also Williamson v. Bethlehem Steel Corp.*, 468 F.2d 1201 (2d Cir.1972), *cert. denied*, 411 U.S. 931, 935 S.Ct. 1893, 36 L.Ed.2d 390 (1973) (approval of private injunctive order that directly conflicted with prior government injunction order).

We agree, however, that the affirmative action plan *does* work an inequity upon the minorities not included in the *Shimkus* class and, hence, not protected by the Decree. The Decree, by providing relief in the form of objective residency requirements, and limiting that relief to blacks, effectively imposes an additional burden on non-black minorities. Those persons who qualified for units in one of the targeted apartment developments will lose them to qualified blacks until that development has satisfied the requirements of the plan, even though that development previously discriminated against *both* minority groups.

We find persuasive the reasoning applied in *Williams v. City of New Orleans*, 729 F.2d 1554 (5th Cir.1984) (en banc). *Williams* was a Title VII action involving a consent decree providing relief for blacks in the form of an affirmative action quota. After considering the interests of all affected parties, the appeals court affirmed the

---

**2.** According to qualification standards for all

applicants established by that Gersten complex.

district court's rejection of the affirmative action quota in part because it would impose undue hardship upon non-black minorities. *Id.* at 1560, 1561, 1563–65.[3]

The quota in *Williams* required the New Orleans Police Department to promote black and white officers "on a one-to-one ratio until blacks constituted 50% of the NOPD...." *Id.* at 1556. By requiring the NOPD to allot a specified percentage of its promotions to blacks, "the quota would create separate promotional tracks," and require non-black minorities to compete for fewer positions. *Id.* at 1563.

This is precisely our concern here. Although the Shimkus Decree's affirmative action plan is far less rigid than the quota used in *Williams*, the plan allots a specified percentage of vacant units to qualified blacks. The non-black minorities not only lose these units to blacks, but they must also compete with whites for the reduced number of vacancies.

In *Williams*, the non-black minorities intervened and represented their interests as parties. Here, the non-black minorities did not intervene. Their interests were represented, at best, indirectly by the government. The question then is not whether the affirmative action plan is valid, but is rather whether the non-black minorities should have been joined as necessary parties under Federal Rule of Civil Procedure 19(a).[4]

We recognize that Rule 19(d) provides an "exception" for class actions. It states that Rule 19 is "subject to the provisions of Rule 23." Fed.R.Civ.P. 19(d). Some courts have held that this language precludes the use of Rule 19 in class action proceedings. *See Thompson v. Board of Education*, 71 F.R.D. 398 (W.D.Mich.1976); *Pentland v. Dravo Corp.*, 152 F.2d 851 (3d Cir.1945).

We hold that Rule 19(d) simply requires us to respect the language of Rule 23, but allows joinder to the extent its use does not conflict with Rule 23's *provisions. See* Rule 19(d). The *Shimkus* class was properly certified, *see* Rule 23(a), (b)(2); *Castro v. Beecher*, 459 F.2d 725, 728–32 (1st Cir. 1972), although it would have been more economical if the class had included non-black minorities. The joinder that we consider is one of classes, rather than individuals. This minimizes the number of named parties before the court and preserves the usefulness of the class action device. *See* 3A Moore's Federal Practice ¶ 19.21 (1986).

█ It is the peculiar circumstances of this case that move us to take this unusual step. Here, we find consideration of joinder appropriate because (1) not just blacks, but numerous classes of minorities, have suffered housing discrimination by Gersten; (2) the relief obtained by blacks will affect adversely the interests of non-black minorities who likewise suffer discrimination; and (3) these non-black minorities were not directly represented in the action.

At least one other court has invoked Rule 19 in the context of a class action. In *Alabama v. Blue Bird Body Co.*, 71 F.R.D.

---

3. The *Williams* court divided over the question whether relief could be accorded members of a minority group that had not suffered the discrimination in question. We express no view on this question and limit our adoption of *Williams* to the language in Judge Williams' lead opinion that speaks to the interests of non-black minorities.

4. Federal Rule of Civil Procedure 19(a) provides, in pertinent part:
   (a) *Persons to be Joined if Feasible.* A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

Here, we assume it is feasible to join the non-black minorities discriminated against by Gersten. These classes are identifiable and can evidence discrimination by the targeted Gersten apartment complexes. *Cf. Wygant v. Jackson Board of Education*, —— U.S. ——, 106 S.Ct. 1842, 1852 n. 13, 90 L.Ed.2d 260 (1986) (the rejected affirmative action plan included minority groups that were difficult to identify and that had not evidenced discrimination).

183 (D.Ala.1976), the court used the Rule to justify the presence and standing of a plaintiff class representative, and his class, as one of three plaintiff classes:

> [i]t is the opinion of the Court that he is a proper party within the meaning of Rule 19, Federal Rules of Civil Procedure, as he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may, as a practical matter, impair his ability to protect that interest.

*Id.* at 187.

While *Alabama* does not use Rule 19 to compel joinder, it demonstrates that it may be used in conjunction with Rule 23 and may support the inclusion of additional classes to those already in the action.

A Court of Appeals may invoke Rule 19 *sua sponte. Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 88 S.Ct. 733, 738–39, 19 L.Ed.2d 936 (1968); *Klaus v. Hi-Shear Corp.*, 528 F.2d 225, 235 (9th Cir.1975). Because the rule is stated in the disjunctive, we need show only that one of the two prongs applies. Here, Rule 19(a)(2) applies.

Under Rule 19(a)(2)(i), these non-black minorities clearly have an interest relating to the subject of this action: remedying housing discrimination in Gersten apartments. The disposition of this action without their joinder clearly impairs *and* impedes their ability to protect that interest. The Shimkus Decree not only imposes an unfair burden on those minority persons but would require them to bring another federal action seeking consent decree to avoid those burdens. This is not as simple as Shimkus seems to assert. The *Shimkus* plaintiffs would likely oppose an order that would provide equal relief to all discriminatees because it would deprive them of their advantage relative to other minorities. It would be ironic if a decree to remedy discrimination effectively pitted one minority group against another.

Rule 19(a)(2)(ii) also favors joinder of the non-black minorities. Without their joinder, Gersten is clearly "subject to a substantial risk of incurring double, multiple, or inconsistent obligations." Fed.R.Civ.P. 19(a)(2)(ii). Gersten would have to defend each subsequent minority class action. Each additional consent decree would increase Gersten's obligations to provide apartment units to minority applicants. Inconsistencies between decrees may well arise as they already have.

Although not a factor specified in Rule 19(a), judicial economy favors joining the non-black minorities. The *Shimkus* plaintiffs urged at oral argument that other minorities, including Hispanics, Koreans, Vietnamese and other Asians should each be required to bring an independent action against Gersten. If that were to happen, the court would be burdened, Gersten would have to defend multiple suits, and separate decrees would invite controversies between the several groups of minorities. We find this proposition somewhat outrageous.

The court in *Williams* said as much: "The purpose behind examining a proposed consent decree's effect on third parties is to protect the rights of those parties as well as to eliminate the need for subsequent lawsuits." *Id.* at 1563–64.

The Fifth Circuit's recognition of the need to consider the interests of *all* parties affected by an affirmative action plan, and of doing so in the same litigation, favors our decision here to require joinder. *See Williams*, 729 F.2d at 1563–65.

## CONCLUSION

The court abused its discretion in issuing the Shimkus Decree without joining as necessary parties the non-black minorities against whom Gersten discriminated. We remand that the court may determine which non-black minority classes suffered Gersten's discrimination and should be joined. The Shimkus Decree should be modified to provide relief to all identifiable discriminatee classes commensurate with the injury borne by each class.

REVERSED and REMANDED. The parties will bear their own costs on this appeal.