James ELLIS, Plaintiff–Appellee,

v.

CITY OF LA MESA, et al., Defendants–Appellants.

Philip PAULSON, Howard T. Kreisner & Society of Separationists, Inc., Plaintiffs–Appellees,

v.

CITY OF SAN DIEGO, Defendant–Appellant.

John MURPHY, Plaintiff–Appellee,

v.

Brian BILBRAY, George Bailey, Susan Golding, Leon Williams, and John Mac-Donald, in their official capacities as members of San Diego County Board of Supervisors and the County of San Diego, Defendants–Appellants.

Nos. 92–55086, 92–55087 and 92–55093.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 5, 1992.

Submission Withdrawn June 23, 1992.

Resubmitted March 16, 1993.

Decided March 23, 1993.

Mary Kay Jackson, Deputy City Atty., San Diego, CA, for defendants-appellants.

John S. Meyer, Knutson & Meyer, La Mesa, CA, for defendants-appellants.

Michel B. Poynor, Deputy County Counsel, San Diego, CA, for defendants-appellants.

Marcellee E. Mihaila, Gray, Cary, Ames & Frye, San Diego, CA, amicus curiae Mt. Soledad Memorial Ass'n, for defendants-appellants.

Arlington Ray Robbins, Robbins & Keehn, APC, San Diego, CA, amicus curiae In Pro Se, for defendants-appellants.

Anthony Caso, Pacific Legal Foundation, Sacramento, CA, amicus curiae Pacific Legal Foundation, for defendants-appellants.

Thomas F. Gede, Special Asst. Atty. Gen., Sacramento, CA, amicus curiae State of Cal., for defendants-appellants.

John L. Romaker, San Diego, CA, Amicus Curiae Committee to Save the Crosses, an unincorporated Ass'n, and the San Diego County Republican Party, for defendants-appellants.

Keith A. Fournier, Virginia Beach, VA, amicus curiae American Center for Law & Justice, for defendants-appellants.

John W. Vinson, Society of Separationists, Inc., Austin, TX, for plaintiff-appellee.

Michael L. Crowley, Betty Wheeler, American Civil Liberties Foundation of San Diego & Imperial Counties, San Diego, CA, for plaintiff-appellee.

Dan Bacal, El Cajon, CA, for plaintiff-appellee.

David Ira Berman, San Diego, CA, amicus curiae Anti Defamation League of B'Nai B'rith, for plaintiffs-appellees.

Steven Green, Silver Springs, MD, amicus curiae Americans United For Separation of Church and State, for plaintiff-appellee.

Peter Irons, Earl Warren Bill of Rights Project, San Diego, CA, for plaintiff-appellee.

Before: TANG, SCHROEDER and BEEZER, Circuit Judges.

BEEZER, Circuit Judge:

We consider three crosses. A 36-foot cross stands atop Mt. Helix in a county park. Another hilltop cross, the 43-foot Mt. Soledad Cross, stands in a city park. The third cross, a depiction of the Mt. Helix Cross, provides the focal point for one of the City of La Mesa's official insignia.

As to each, a lawsuit ensued. After consolidating the cases, the district court heard motions and cross-motions for summary judgment. Relying primarily on *Hewitt v. Joyner*, 940 F.2d 1561 (9th Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992), the court concluded that the crosses' permanent presence on public property violates the No Preference Clause of California's Constitution. The court entered summary judgment in favor of the plaintiffs and issued "a permanent injunction forbidding the permanent presence of each cross on the public property or imprimatur where it currently appears." The government entities timely appealed. We affirm.

## I

### A. The Mount Helix Cross

In the mid-1920's, Cyrus Carpenter Yawkey and Mary Yawkey White placed a 36-foot Latin cross [1] on the summit of Mount Helix on privately owned land. The cross was erected as a memorial to Mary Carpenter Yawkey. Mt. Helix is one of the highest hills in San Diego County, and the cross is visible from a substantial distance. The

---

**1.** A Latin cross is "a figure of a cross having a long upright shaft and a shorter crossbar traversing it above the middle." Webster's New International Dictionary (3d ed. 1981).

cross also serves pilots as a navigational aid.

In 1929, Yawkey conveyed about 3.2 acres, including the cross and an amphitheatre, to San Diego County for uses and purposes specified in the deed. This county park is known as the Mt. Helix Nature Theatre. The conveyance obligates the County to maintain the cross, allows no other monuments to be erected in the park, and requires that "annually, on each and every Easter Sunday forever, religious services of a strictly non-sectarian character and appropriately suitable for commemorating the resurrection of the Lord Jesus Christ, as taught by the Christian churches of the world, shall be held at Sunrise" at the park. Although an Easter sunrise service has been held in the park every year since, the County stresses that it never enforced this provision against an applicant desiring to use the park for an alternative purpose on Easter morning.

The deed also established a trust fund, with the County as trustee, to maintain the cross and to contribute towards the Easter celebration. County employees administer the trust fund. Public funds contribute to the maintenance of the Nature Theatre as a whole.

The deed further requires that "[t]he Cross on the summit of Mount Helix shall be lighted" on several specific nights each year, including Christmas Eve and the evening before Easter. The County illuminates the cross every night of the year; the trust fund currently pays for the lighting, but county funds had been used for this purpose in the past.

Subsequent to the filing of this case, the County Board of Supervisors designated the Mt. Helix Nature Theatre and the cross within it as a historical landmark.

**B. The Mount Soledad Cross**

In 1913, private citizens placed a redwood cross atop Mount Soledad on a 170–acre parcel of land owned by the City of San Diego. The city council dedicated the property as a public park in 1916. Vandals destroyed the redwood cross in 1923; someone replaced it with a wood and stucco cross in 1934. A wind storm destroyed that cross in 1952. Subsequently, the city council granted permission to the Mt. Soledad Memorial Association, a private organization, to place another cross on Mt. Soledad. The Association solicited private contributions and, without municipal funding, supervised and paid for the construction of the current 43–foot concrete cross. On some maps and in the local parlance, it is known as the "Soledad Easter Cross." The Mt. Soledad and Mt. Helix crosses have both provided a backdrop for weddings and baptisms.

The Soledad Cross can be seen from a substantial distance, including a portion of the interstate highway. The district court's summary judgment order states that the cross functions as the most important geodetic marker in San Diego County.

In 1954, at an Easter Sunday religious service, the cross was dedicated as a tribute to veterans of World War I, World War II and the Korean Conflict. The Association maintains the cross and, since its dedication, obtains a permit each year to conduct a sunrise service on Easter Morning. Although primarily maintained through private funds, the district court found some public funds have been expended to maintain the cross.[2] Since the filing of this action, veterans groups have held secular remembrance ceremonies at the site.

In its summary judgment order, the district court erroneously stated that the Mt. Soledad Cross, like the Mt. Helix Cross, is illuminated nightly. The parties agree that the Mt. Soledad Cross used to be illuminated, but that the practice ended after vandals repeatedly broke the lights.

On January 30, 1991, after this action was filed, the City of San Diego Historical Site Board designated the cross and the surrounding park as historical sites.

**C. The La Mesa Insignia**

The City of La Mesa's official insignia depicts a cross atop the highest of several

---

**2.** The district court found that a painting supervisor with the City of San Diego's Building Maintenance Department paid a contractor $1,750.00 to repaint the cross.

hills, in the center of the design, between two clouds. The artist drew the cross several times larger than it would be if drawn to scale. As found by the district court, the insignia was chosen not because it incorporates a religious image, but rather because it depicts the prominent, identifying landmark for the city known as "The Jewel of the Hills."

At the time of this lawsuit, the insignia appeared on police vehicles and on the shoulder patches attached to police, fire fighter, and animal control personnel uniforms, and was used in official literature distributed by the city. The city maintains an official seal which does not depict a cross.

## II

### A. Abstention

■ Appellants argue that the district court should have exercised abstention pursuant to the doctrine announced in *Texas Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). We review the district court's refusal to abstain for an abuse of discretion. *Almodovar v. Reiner,* 832 F.2d 1138, 1140 (9th Cir.1987).

■ *Pullman* abstention is appropriate where the state's constitution contains a provision unlike any in the federal constitution and state court construction of its unclear or ambiguous clause might make a federal ruling unnecessary. *Reetz v. Bozanich,* 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970) (abstention appropriate given that the unique fishing provisions in Alaska

Constitution had not been interpreted by Alaska courts).

Appellants argue that the California courts' interpretation of the state constitution's religion provisions remains unclear or, if relatively clear, poised for change. *See Pearl Inv. Co. v. City and County of San Francisco,* 774 F.2d 1460, 1465 (9th Cir.1985) ("Uncertainty for purposes of *Pullman* abstention means that a federal court cannot predict with any confidence how the state's highest court would decide an issue of state law.") (citation omitted), *cert. denied,* 476 U.S. 1170, 106 S.Ct. 2891, 90 L.Ed.2d 978 (1986).

■ The legal landscape presented here differs dramatically from that presented in *Reetz* by Alaska's unique and uninterpreted constitutional provisions regarding fishing rights. Here, we have interpretive caselaw. *See Fox v. City of Los Angeles,* 22 Cal.3d 792, 150 Cal.Rptr. 867, 587 P.2d 663 (1978) (interpreting California Constitution's religion clauses); *Okrand v. City of Los Angeles,* 207 Cal.App.3d 566, 254 Cal. Rptr. 913 (1989) (same).[3] Moreover, this is not the first time we have had occasion to interpret the religion clauses of the California Constitution. *See Hewitt, supra* (discussing California case law regarding the No Preference Clause).

We perceive no "special circumstances" warranting *Pullman* abstention. *Kusper v. Pontikes,* 414 U.S. 51, 54, 94 S.Ct. 303, 306, 38 L.Ed.2d 260 (1973) (citations omitted). Accordingly, we hold that the district court did not abuse its discretion in reaching the merits of these cases.

**3.** We note that the California Supreme Court has recently addressed the No Preference Clause. In *Sands v. Morongo Unified School Dist.,* 53 Cal.3d 863, 281 Cal.Rptr. 34, 809 P.2d 809 (Cal.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3026, 120 L.Ed.2d 897 (1992), the plurality quoted with approval the state Attorney General's observation that "[i]t would be difficult to imagine a more sweeping statement of the principle of government impartiality in the field of religion" than that found in the No Preference Clause. *Id.* 281 Cal.Rptr. at 45, 809 P.2d at 820 (citation omitted).

Two members of the court expressly disagreed with the plurality's strict separationist

reading of the California Constitution. *See id.* 281 Cal.Rptr. at 80, 809 P.2d at 855 (Pannelli, J., dissenting); *id.* 281 Cal.Rptr. at 88, 809 P.2d at 863 (Baxter, J., dissenting). Two other members of the court declined to address the California Constitution at all. *See id.* 281 Cal.Rptr. at 58, 809 P.2d at 833 (Lucas, C.J., concurring); *id.* 281 Cal.Rptr. at 67, 809 P.2d at 842 (Arabian, J., concurring).

We do not read the varied viewpoints expressed in *Sands* as necessarily portending an interpretive shift, nor do we read *Sands* as undermining in any way prior state court opinions interpreting the No Preference Clause.

## B. Standing

Standing is a question of law we review *de novo*. *See Bruce v. United States*, 759 F.2d 755, 758 (9th Cir.1985). To have standing to bring this lawsuit in federal court, each plaintiff must "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted). Appellants argue that the plaintiffs fail to meet this standard.

We recently followed other circuits in holding that "when a plaintiff alleges that the government has unconstitutionally aligned itself with religion, standing may be based on finding that the plaintiff has been injured due to his or her not being able to freely use public areas." *Hewitt*, 940 F.2d at 1564 (citing *ACLU of Illinois v. City of St. Charles*, 794 F.2d 265 (7th Cir.), *cert. denied*, 479 U.S. 961, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986), and *ACLU of Georgia v. Rabun County*, 698 F.2d 1098 (11th Cir. 1983)).

In *ACLU of Illinois*, the court found that the plaintiffs had standing where they departed from their usual route to avoid observing a government-owned, lighted cross. 794 F.2d at 267–69. In *ACLU of Georgia*, the court found that the plaintiffs had standing where they stopped using a state park which included a large illuminated cross. 698 F.2d at 1107–08.

John Murphy, a Catholic San Diego resident and taxpayer, challenges the constitutionality of the Mt. Helix Cross. Murphy attests that he "is offended by the use of public property and the expenditure of public money to display and illuminate the cross on Mt. Helix." Although he "otherwise would visit the [Mt. Helix Nature] Theatre and take out-of-town guests there to enjoy the panoramic view it offers, [he instead] avoids visiting the Theatre because of the large cross."

Philip K. Paulson and Howard T. Kreisner challenge the constitutionality of the Mt. Soledad Cross. Both Paulson and Kreisner are atheists, Vietnam combat veterans, San Diego residents, and taxpayers. They say that they are "deeply offended" by the presence of the cross on Mt. Soledad. Both attest that they would like to take in the spectacular views of San Diego from the park on Mt. Soledad but avoid doing so because of the cross' dominance of the hilltop.

Paulson and Kreisner are both members of the Society of Separationists, another plaintiff in the action contesting the maintenance of the Mt. Soledad Cross on public property. The Society, which is licensed to do business in California, is "dedicated to the complete and absolute separation of state and religion/church."

James Ellis, an Episcopalian, La Mesa resident, and taxpayer challenges the La Mesa insignia. He maintains that he is "deeply offended" by the expenditure of taxes for the purchase and use of insignia depicting a religious symbol. In order to avoid offending business clients or embarrassing himself, he has declined to invite business clients to his home when, but for the presence of the cross on the insignia, he would have invited them.

In all three of these cases, the district court properly determined that a plaintiff "has been injured due to his or her not being able to freely use public areas." *Hewitt*, 940 F.2d at 1564. Murphy, Paulson, and Kreisner avoid two public parks in San Diego which they would otherwise use. Ellis curtails his activities to lessen contact with the insignia displayed in his city. The Society of Separationists has standing through its members, co-plaintiffs Paulson and Kreisner. The district court properly held each of the named plaintiffs had standing to bring this case before the court. *See Kreisner v. City of San Diego*, 988 F.2d 883, 887 n. 1 (9th Cir. March 3, 1993) (plaintiff's standing based on allegation that the challenged display interfered with his right to use public park).

## III

We review *de novo* both the district court's grant of summary judgment,

*Schlacter–Jones v. General Tel. of Cal.,* 936 F.2d 435, 438 (9th Cir.1991), and its interpretation of state law, *Hewitt,* 940 F.2d at 1565.

■ Federal constitutional issues should be avoided when the alternative ground is one of state constitutional law. *Id.* Thus, although the plaintiffs' suits allege both federal and state constitutional violations, we turn first to the California Constitution.

The California Constitution guarantees the "[f]ree exercise and enjoyment of religion without discrimination or preference." Cal. Const. art. I, § 4. This provision is known as the "No Preference" Clause. *See Okrand, supra.*

In *Fox, supra,* the California Supreme Court affirmed an order enjoining the thirty-year practice by the City of Los Angeles of illuminating a cross on City Hall during the Christmas holidays, and enjoining the eight-year practice of illuminating the cross on Easter Sundays, both Latin and Eastern Orthodox. The Court considered the "location, size, and visibility of the Los Angeles cross," noting in particular that the cross was illuminated on City Hall and was visible for many miles in many directions. 150 Cal.Rptr. at 869, 587 P.2d at 665. The court also pointed out that the illumination of only the Latin cross seemed "preferential when comparable recognition of other religious symbols is impracticable." *Id.* When viewed in its factual context, the court held the display of the cross violated the No Preference Clause of the California Constitution.

A more recent California case follows *Fox*'s context specific approach. In *Okrand,* the court considered whether the display of an unlit menorah in the rotunda of the Los Angeles City Hall violated the No Preference Clause. 254 Cal.Rptr. at 921.

The *Okrand* court identified four circumstances which materially distinguished the menorah from the cross display in *Fox.* First, the *Okrand* display included religious symbols of comparable religious significance to other religions. *Id.* at 921. Second, the menorah was less conspicuous than the lighted, outdoor cross in *Fox. Id.* Third, a menorah is less religiously symbol-

ic than a Latin cross. *Id.* at 922. Fourth, the Katowitz Menorah, which was crafted in a distinctive style and had been rescued from the Nazi Holocaust, had a "unique historical background [which rendered it] ... much more a museum piece than a symbol of religious worship." *Id.* Based on these factors, the *Okrand* court concluded "that in the context in which it allowed the Katowitz Menorah to be displayed, the city exhibited no preference for the Jewish religion nor promoted it." *Id.*

We have also had occasion to interpret California's No Preference Clause. In *Hewitt,* we considered whether San Bernardino County's ownership and maintenance of a public park that contained religious statutes violated the California Constitution.

Analyzing California case law, we interpreted *Fox* and *Okrand* to stand for the proposition that "not only may a government body not prefer one religion over another, it may not *appear* to be acting preferentially." 940 F.2d at 1567. We then applied this standard to the historical and physical context surrounding the County park.

San Bernardino county, after taking ownership of the park, had dedicated it "Desert Christ Park," and "printed brochures which identif[ied] each of the statuary scenes by reference to Bible passages." *Id.* at 1563. This official brochure also described the statuary located on church property adjoining the park, and described these statues as being part of the park. Indeed, the largest of the park's statues, the Last Supper, straddled the property line of the church and the park.

Given these facts, we found "[t]he effect and message of the park is a religious one." *Id.* at 1568. Viewing the historical and physical context of the park as a whole, we held the County's ownership of the park "depicts a government-endorsement of the Christian faith" in violation of article I, section 4 of the California Constitution. *Id.* at 1569.

■ Various factors can be distilled from *Fox, Okrand,* and *Hewitt* that are

relevant to determining whether, when viewed in its historical and physical context, a given display on public property violates the California Constitution. These factors include 1) the religious significance of the display, 2) the size and visibility of the display, 3) the inclusion of other religious symbols, 4) the historical background of the display, and 5) the proximity of the display to government buildings or religious facilities.

## A. The Mt. Helix Cross

### 1. *Public Property*

■ As a threshold consideration, we must determine if the display is on public property. When the district court issued its order in this case, the Mt. Helix Cross stood on land which the Yawkeys had conveyed to the County for the use and benefit of the public.[4] The County argues that the private funds which built and maintain the cross mute any message of governmental involvement; the Yawkey family built the cross on their property, set up a trust fund to be used for its maintenance, and established as a trust condition the establishment of an annual Easter sunrise service.

Had the Yawkeys kept the land as private property, there would be no issue, no question of government involvement. However, they transferred the cross and surrounding land to the County. Pursuant to the conditions of the transfer, the County maintains the park and acts as trustee, responsible for fulfilling the terms of the trust document. As with the religious statuary in *Hewitt*, prior construction with private funds does not negate the message of subsequent maintenance on public land.

The County points out that removing the cross might trigger the reversionary clause in the deed that conveyed the park to the County. Reversionary clauses, however, are hidden from the public view and cannot themselves mitigate an appearance of religious preference. Whatever the effect of our decision today on the ultimate disposition of the cross and the surrounding prop-

erty, such considerations are irrelevant to determining whether public involvement with the cross, as it stands, violates the No Preference Clause of the California Constitution.

For the same reason, the fact that the cross also serves as a navigational aid, or stands as a prominent landmark and tourist attraction, does nothing to ameliorate a violation of article I, section 4. If anything, such facts underscore the formidable nature of the display and increase the likelihood of an impermissible appearance of religious preference.

### 2. *Religious Significance*

The displayed item in this case, as in *Fox*, is a Latin cross. Appellants argue that the cross has been secularized to the point that it now functions as a general, secular memorial.

■ The Supreme Court of California has held that the Latin cross carries a greater degree of religious significance than Santa Claus or the Easter Bunny. *See Fox*, 150 Cal.Rptr. at 870, 587 P.2d at 666 ("Easter crosses differ from Easter bunnies, just as Christmas crosses differ from Christmas trees and Santa Claus."). Indeed, the Latin cross "is the preeminent symbol of many Christian religions and represents with relative clarity and simplicity the Christian message of the crucifixion and resurrection of Jesus Christ, a doctrine at the heart of Christianity." *Okrand*, 254 Cal.Rptr. at 922. This symbolism is evidenced by the cross' use as a backdrop for Christian celebrations such as baptisms, weddings, and Easter sunrise services.

We find unpersuasive the fact that the cross was built and dedicated as a memorial to a private individual before being conveyed, in trust, nevertheless, to the County. This alone cannot transform the cross into a secular memorial. As the plaintiff's counsel observed, "[t]he people who go to Mt. Helix for annual Easter services are

---

**4.** Since this time, the County has conveyed the cross and a small piece of land upon which the cross stands to a private organization.

there to commemorate Jesus Christ, not Mary Yawkey."

### 3. *Size and Visibility*

■ The district court found that the religious symbolism of the Mt. Helix Cross is further amplified by its sheer size and visibility. Indeed, the 36–foot cross stands alone at the summit of a high hill and is illuminated nightly. It dominates the area, as did the statues in *Hewitt. See Hewitt,* 940 F.2d at 1568.

### 4. *Inclusion of Other Religious Symbols*

■ The Mt. Helix Nature Theatre includes no other religious symbols. Indeed, the deed itself prohibits the display of any other religious symbols. Thus, the appearance of preference is not neutralized, as it was in *Okrand,* by the inclusion of symbols associated with other religions. *Okrand,* 254 Cal.Rptr. at 918 (display with menorah included, among other objects, a Christmas tree).

The County urges us to look at the entire park system for representation of other religions. The County points specifically to San Diego's first synagogue, Temple Beth Israel, a designated historic site and part of a county park. Although this speaks to an inclusive approach by the park system as a whole, it does nothing to ameliorate the appearance of preference in this particular park. The California courts have not looked beyond the immediate area of the display in determining whether other religions are sufficiently represented. We also decline to do so.

### 5. *Historical Significance*

■ The cross atop Mt. Helix has stood there since the 1920's as a prominent county fixture associated with an annual Easter sunrise service. Article I, section 4, however, requires more than mere longevity; a display's historical significance must be in-

dependent of the display's religious content. Even a purely religious symbol may acquire independent historical significance by virtue of its being associated with significant non-religious events. In *Okrand,* for instance, the Menorah had been saved from the Holocaust and was "much more a museum piece than a symbol of religious worship." *Okrand,* 254 Cal.Rptr. at 922.

In this case, the County provides no historically significant facts independent of the cross' inherently religious nature. Indeed, it appears the most historically significant aspect of the cross is its long-standing use as the site of annual Easter services. This kind of historical significance simply exacerbates the appearance of governmental preference for a particular religion.

### 6. *Location*

■ The Mt. Helix Cross is not located on an explicit government edifice as were the city hall displays challenged in *Fox* and *Okrand.* Moreover, this cross is not associated with neighboring church property, as was the statuary in *Hewitt.*

The mere fact that the display stands on public property is not enough to call into play the particular locational concerns of *Fox* and *Okrand.* In those cases it was the conjunction of religious symbolism with the institutions of government that enhanced the appearance of government endorsement of religion.

No one factor, however, necessarily produces or prevents an appearance of religious preference. The court must look to the particular facts in each case in order to determine if the No Preference Clause has been violated. In this case, the size and religious significance of the cross, along with the lack of other religious symbols or independent historical significance, creates an appearance of religious preference. This is so despite the cross' distance from city hall.[5]

---

**5.** We note that the district court for Northern California has recently held a cross similar to the one in this case does *not* violate the No Preference Clause of the California Constitution. *See Carpenter v. City and County of San Francisco,* 803 F.Supp. 337 (N.D.Cal.1992). The differ-

ent result in *Carpenter* highlights the fact-based contextual inquiry required by these kinds of cases.

In *Carpenter,* the district court found the cross was located in a remote place, was only partially visible on a clear day, did not domi-

## B. The Mt. Soledad Cross

The Mt. Soledad Cross suffers from the same constitutional infirmities as does the Mt. Helix Cross. Accordingly, we summarize those infirmities while focusing on the ways in which the City of San Diego asserts the cross on this hilltop is different from the one atop Mt. Helix.

■ As discussed above, the Latin cross is the preeminent symbol of Christianity. As was the case with the Mt. Helix Cross, this symbolism is further evidenced by its use as a backdrop for Christian celebrations such as baptisms, weddings, and Easter sunrise services. As was also the case with the Mt. Helix Cross, the Mt. Soledad Cross stands as the focal point of the park, visible to those looking at the hill from a substantial distance.[6] Finally, we note that the city park which contains the cross does not include comparable symbols of other religions to moderate the cross' sectarian message.

The historic background of this cross differs from the Mt. Helix Cross. Since 1913, a cross has stood on public property in the area where the Mt. Soledad Cross now stands. Built in 1954, the current cross was dedicated to veterans of World Wars I & II and the Korean War. According to the city, the cross has taken on a secular commemorative meaning as a veterans memorial and historical landmark.

The district court considered this argument and concluded that "the evidence indicates that the city's purported commemorative objective is a pretext." The 1913 and 1934 crosses had no memorial associations. The current cross was dedicated on Easter morning in a Christian religious ceremony, even though Memorial Day falls not long after Easter.

The City and the Association challenge the court's identification of this Easter dedication as the only occasion before the filing of this lawsuit at which the cross site has ever been recognized as a war memorial. In support of this claim, the City and the Association have submitted for our consideration documents which suggest the American Legion identified the cross as a war memorial and considered installing a commemorative plaque. The documents also include several newspaper articles, particularly from the 1950's, which refer to the site as a war memorial and indicate that at least two ceremonies honoring veterans took place at the site in the decades before this suit was filed. Finally, the articles suggest that the Easter services have included memorial aspects. For example, in past services organizers stood empty mortar shells at either side of the podium and representatives from military organizations took part in the celebration.

We note as an initial matter that these documents were not before the district court and therefore cannot be considered part of the record on appeal. However, even if we were to agree that the cross has always been explicitly recognized and referred to as a war memorial, that would not obviate the appearance of preference.

A sectarian war memorial carries an inherently religious message and creates an appearance of honoring only those servicemen of that particular religion. *See Jewish War Veterans of the United States v. United States*, 695 F.Supp. 1, 14–15 (D.D.C.1987) (court ruling that a cross, "[t]he principal symbol of Christianity, this

---

nate the horizon when it could be seen, and could not be seen at all at night. *Id.* at 341. As we have already noted, the Mt. Helix Cross can be seen from a substantial distance and sits alone atop one of the highest hills in San Diego County. Moreover, unlike the present case, the cross in *Carpenter* was shown to have independent historical significance. *Id.* at 348.

**6.** In its order, the district court noted that the cross' "commanding presence *and nightly illumination* at the very summit of Mt. Soledad render it the focal point of the public park in which it stands—so much so that it may be said,

as between the Latin cross and the park, it is not clear which is meant to adorn which." (emphasis added).

All parties agree that the cross is not now illuminated. The city argues that the court's erroneous factual determination formed a core of its ruling, thus mandating reversal and remand. We disagree. The district court elaborated many reasons for the cross' prominence; lighting was just one of them. Lighted or not, the cross has, in the district court's words, a "commanding presence."

nation's dominant religion, simply is too laden with religious meaning to be appropriate for a government memorial assertedly free of any religious message."); *Greater Houston Chapter of ACLU v. Eckels,* 589 F.Supp. 222, 235 (S.D.Tex.1984) ("[E]ven if one strains to view the [cross] in the context of a war memorial, [its] primary effect is to give the impression that only Christians … are being honored."), *appeal dismissed,* 755 F.2d 426 (5th Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985). *But cf. Eugene Sand & Gravel, Inc. v. City of Eugene,* 276 Or. 1007, 558 P.2d 338, 346 (1976) (en banc) (display of a large cross in a public park as a veterans war memorial does not violate federal Constitution), *cert. denied,* 434 U.S. 876, 98 S.Ct. 226, 54 L.Ed.2d 155 (1977).

While not commenting on whether such memorials violate the federal Constitution, we hold that the mere designation of a display as a "war memorial" is not enough to satisfy the more separationist No Preference Clause of the California Constitution. *See Hewitt,* 940 F.2d at 1567 (noting that religion clauses of California Constitution are read more broadly than their counterparts in the federal Constitution).

### C. The La Mesa Insignia

██ The district court accepted as reasonable the City of La Mesa's explanation that "the cross on the city's insignia is intended to represent a well-known local feature identifiable with La Mesa and, in so doing, to render the city's property and personnel more readily identifiable." We also accept this as the purpose for adoption of the insignia. This secular purpose does not, however, lessen the preference the insignia exhibits for Christianity.

The cross is the focal point of this insignia. It is larger than it would be if drawn to scale, and it occupies the center of the design. Although the insignia also includes clouds and hills, the cross stands out. Whatever the intent, the insignia's design draws particular attention to the cross.

The use of the insignia is particularly troubling. It is attached to uniforms, included on official correspondence, and prominently displayed on police motor vehicles. A design that focuses attention on the cross, when affixed to the uniforms of government officials, creates the appearance of religious preference. We do not hold that any depiction of a cross on an official insignia in California violates the No Preference Clause; we hold only that this particular design violates article I, section 4.

### IV

Pursuant to its holding, the district court issued a permanent injunction "forbidding the permanent presence of each cross on the public property or imprimatur where it currently appears." The court further granted the defendants three months "within which to comply with its order." The court did not state what actions the defendants must take in order to comply with the injunction.[7] Following the issuance of that injunction, various actions have been taken which implicate the present and future status of the Mt. Soledad and Mt. Helix crosses.

On February 24, 1992, the City of San Diego voted to authorize the sale of a 15-foot square parcel of land underneath the Mt. Soledad Cross to the Mt. Soledad Memorial Association for $14,500. On June 2, the voters authorized the sale. This sale, however, has not yet taken place.

On February 25, San Diego County voted to give the San Diego Historical Society the Mt. Helix Cross and a 30-foot diameter parcel of land beneath the cross. This transfer has been effected.

---

**7.** The district court did give some indication of what it believed were alternative methods of complying with its judgment. Addressing the relevance of the costs the County will incur should the existence of the Mt. Helix Cross on public property be found unconstitutional, the court held that "the economic expense of removing the cross, of rendering non-public the property on which the cross stands or of otherwise attempting to cure the present infirmity may not bear on the constitutional challenge presently before the court." *Murphy v. Bilbray,* 782 F.Supp. 1420, 1433–34 (S.D.Cal.1991).

The plaintiffs, in supplemental briefing, argue that both the authorized and completed transfers violate the state and federal constitutions and constitute a bad-faith and illegal end-run around the district court's order. The plaintiffs urge us to resolve the issues. We decline to do so.

These questions relate not to the validity of the injunction before us for review, but to how compliance with that injunction may be effected. Any issues concerning compliance with the injunction should be decided in the first instance by the district court.

AFFIRMED

BEEZER, Circuit Judge, specially concurring:

The writer of the court's opinion deems it necessary to complete the record in order to point out why, in writing for the court, he said nothing about the injunctive relief contained in the district court's summary judgment order.

The district court correctly declared that the permanent presence of the disputed crosses on public property violates the No Preference Clause of the California Constitution. However, San Diego County claims that the Mt. Helix Cross has been transferred to the San Diego Historical Society. Likewise, the City of San Diego claims it is authorized to transfer the Mt. Soledad Cross. The plaintiffs claim that both actions thwart the injunctive relief granted by the district court.

These matters involve enforcement of the injunction and must first be considered by the district court. The district court,

however, did not explicitly state the manner in which its injunction was to be enforced.[1] Given their dissatisfaction with the property transfers, one can suppose the plaintiffs will call upon the district court to enforce the injunction by requiring the removal or destruction of the crosses. Destruction of the crosses, however, raises as many issues as it resolves.

## A. The Mt. Helix Cross Conveyance

The original 1929 Yawkey deed that conveyed the land and the Mt. Helix Cross to the County contained a reversionary clause.[2] No Yawkey heirs were made party to this action in the district court.[3] As noted above, the County claims to have conveyed title to the Mt. Helix Cross and a thirty-foot diameter circle of land beneath it to the San Diego Historical Society. The validity of this conveyance raises a variety of issues involving California property and trust law.

As an initial matter, it is unclear whether the County validly took title of the land in the first place. A municipal corporation cannot ordinarily act as trustee of property to be devoted solely to religious uses. *See* Eugene McQuillin, 10 *The Law of Municipal Corporations*, § 28.31 (3rd ed. 1990). If the County cannot act as trustee under the Mt. Helix conveyance, then either the reversionary clause of the conveyance applies, or the court may prevent the trust from failing by appointing a private trustee. *See id.* at § 28.36.

The reverter clause may no longer be applicable.[4] However, the plaintiffs con-

---

**1.** *See ante,* at note 7.

**2.** The clause reads as follows:
AND IT IS FURTHER PROVIDED, That ... should [the County] ... convey, or attempt to convey ... said premises herein conveyed, or any part or parcel thereof, ... to any person, firm association, organization, or corporation, ... then and in that event, the said premises, and the whole thereof, and said fund and/or funds, and the whole thereof, ... shall forthwith revert to, and the title thereof and thereto vest in, and the whole thereof become the property of the trustor herein, his heirs and assigns, and the heirs and assigns of ... MARY YAWKEY WHITE, Deceased, as fully as if these presents had never been executed.

**3.** The district court explicitly declined to address the reversionary interest issue. *Murphy,* 782 F.Supp. at 1434 n. 36 ("The present lawsuit poses constitutional issues only. It does not provide a sufficient legal or evidentiary basis from which to rule on the sufficiency and application of the deed's reversionary clause.").

**4.** The County argues that, under the Marketable Record Title Act, Cal.Civil Code §§ 885.010, 885.020 (1982), the power of termination expired unless a notice of intent to preserve the power to terminate was recorded within five years after the operative date of the Act. *See id.* at §§ 880.030, 880.370. I express no opinion on whether the power to terminate has in fact expired.

cede that the Yawkey heirs may have an interest if 1) the court finds the original deed created a charitable trust and 2) the actions taken by the County are determined to have caused such trust to fail.[5]

Although the district court noted that "San Diego County is the trustee" of the "funds left in trust ... for the purpose of maintaining the Mt. Helix Nature Theatre,"[6] the court did not determine whether the real property itself is held by the County in trust. A number of issues, then, have yet to be resolved. These include determining whether a trust exists, who are the interested parties under that trust, the existence and effect of the reversionary clause, and what effect the County's transfer has on the trust.

The injunction forbids "the permanent presence of each cross on the public property ... where it appears," and gives the defendants three months to comply with the court's order.[7] It seems to me there are but two ways to comply with this order; the County must either transfer the land or destroy the crosses. Both alternatives implicate the rights of parties not before the court and involve issues undecided by the court. Before the County may transfer the land, it must have title to the land. As noted above, there has been no determination that the initial conveyance to the County was valid in the first place. For similar reasons, the County cannot remove the crosses without potentially violating the property rights of the Heirs of Yawkey who may have legal title to both the land

and the cross. If enforcement proceedings are initiated in the district court, questions of California property law and the joinder of interested parties will undoubtedly be at issue.[8]

## B. The Mt. Soledad Cross

The voter authorization to transfer ownership of Mt. Soledad Cross has no effect on the court's determination today that the status quo violates the California Constitution. As the opinion points out, a challenge to any future transfer should be brought first before the district court.

A more difficult question is whether all parties who have a legal interest in the Mt. Soledad Cross were before the district court when it issued its injunction. The City argues that the Mt. Soledad Cross is owned by the Mt. Soledad Memorial Association and that the interests of the Association were not considered by the district court. According to the City, removing the cross would violate the Association's property rights under state and federal law. Plaintiffs argue that the Association has no legal interest in this litigation because the cross was given to the City as a gift.

Under Federal Rule of Civil Procedure 19(a), a just adjudication requires, if feasible, the joinder of those parties that have "a legally cognizable interest in the suit, and [whose] interest will be impaired or impeded by the suit...." *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558–59 (9th

---

5. Where property is given in trust, but the trust fails for some reason, a resulting trust arises in favor of the grantor or his successors. Witkin, *Summary of California Law*, "Trusts" § 298 (9th ed. 1990); *Restatement (Second) of Trusts* § 335. *See e.g. Evans v. Newton*, 221 Ga. 870, 148 S.E.2d 329 (1966), *aff'd sub nom, Evans v. Abney*, 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634 (1970) (where sole purpose for which the trust had been created had become impossible of accomplishment, the charitable trust has been terminated and a resulting trust is implied for the benefit of the grantor or his heirs).

6. *Murphy*, 782 F.Supp. at 1423 n. 8.

7. It should be noted that stays have been issued pending the outcome of this appeal. *See Paulson v. City of San Diego*, No. 92–55087 (9th Cir.

April 1, 1992) (*en banc*); *Ellis v. City of La Mesa*, No. 92–55086 (9th Cir. Mar. 19, 1992); *Murphy v. Bilbray*, No. 92–55093 (9th Cir. Mar. 19, 1992). These stays will remain in effect until the mandate of this court issues, usually twenty-one days after this opinion is filed. *See* Fed.R.App.P. 41(a).

8. It bears pointing out that, along with any Yawkey heirs, the interests of the San Diego Historical Society should be considered on remand. As the current holders of colorable title to both the cross and the surrounding land, the Society clearly has an interest in the outcome of this litigation.

Cir.1990). *See also Shimkus v. Gersten Companies,* 816 F.2d 1318, 1322 (9th Cir. 1987) (the need to consider the interests of third parties, and to do so in the same litigation, favors a decision to require joinder).

In this case, absent a finding by the district court as to who actually owns the cross, it remains unclear whether all "interested parties" were before the district court when it issued its injunction. As with the Mt. Helix Cross, this is a question of state law and may require the joinder of additional interested parties.

When the mandate issues, proceedings to enforce the injunction may be initiated in the district court. The district court, of course, has continuing power to modify or vacate its decree. *See System Fed'n No. 91, Ry. Employes' Dep't, AFL–CIO v. Wright,* 364 U.S. 642, 647, 81 S.Ct. 368, 371, 5 L.Ed.2d 349 (1961) ("There is ... no dispute but that a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen."). *See also* 11 Charles Allen Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2961 (1973) (noting the "universally recognized principle that a court has continuing power to modify or vacate a final decree"). Upon hearing the claims of the parties, the district court will be able to modify, fashion or enforce appropriate equitable relief as the constitutional and property interests of the respective parties may be determined.