**Paul J. SEIDMAN, et al., Plaintiffs,**

v.

**PARADISE VALLEY UNIFIED SCHOOL DISTRICT NO. 69, et al., Defendants.**

**No. CV 03–472–PHX–PGR.**

United States District Court, D. Arizona.

Aug. 2, 2004.

Benjamin W. Bull, Esq., Gary Stuart McCaleb, Dale Michael Schowengerdt, Alliance Defense Fund Legal Ctr., Peter Andrew Gentala, Center for Arizona Policy, Scottsdale, AZ, for Plaintiffs.

**1102**

Steven Douglas Leach, Esq., Michele Lee Forney, Sanders & Parks PC, Phoenix, AZ, for Defendants.

## *ORDER*

ROSENBLATT, District Judge.

Pending before the Court are the Plaintiffs' and the Defendants' Cross–Motions for Summary Judgment (docs.31–1, 42–1) and the Defendants' Motion to Strike Notice of Supplemental Authority (doc. 58–1). The Court now rules on the motions.

## I. INTRODUCTION

Pinnacle Peak Elementary School is a public school in the Paradise Valley School District. Sometime in the fall of 2002, Pinnacle Peak Elementary School Parent Teacher's Organization ("PTO"), with school authorization, engaged in a fundraising program called "Tiles for Smiles." Parents were encouraged to purchase personalized 4X8 saltillo tiles that would be permanently affixed to the interior elementary school halls. The tiles were sold separately, as well as part of a package deal.

The application form for the individual tiles stated that parents could "immortalize [their] child or family" with a "special message of [their] choosing" subject to the school's reservation of a right to make "minor modifications." The application form also stated that the tiles make "great gifts for kids, parents, teachers, just about anyone." The application form for the package deal stated that the school "reserve[s] the right to make minor modification." Both applications stated that "Business/Company" tiles were also available.

Plaintiffs Ann and Paul Seidman are the parents of Quinn and Haley Seidman. Quinn was a first grade student at Pinnacle Peak Elementary School, his younger sister Haley was not yet of school age. In late August of 2002, Mrs. Seidman submitted an application and payment for two tiles in the Tiles for Smiles Program. Mrs. Seidman requested that one tile bear the message "God Bless Quinn, We Love You Mom & Dad." She requested that the other tile bear the message "God Bless Haley, We Love You Mom & Dad." The school informed Mrs. Seidman that her submitted requests would not be allowed because the school was concerned about the separation of church and state and that she would have to revise her messages so that they did not contain religious expression.

The school also refused five other requested tile messages on the grounds that they contained religious messages. Those messages were: (1) God Bless Our School; (2) God Bless America; (3) God Bless America; (4) Jesus Loves You, Site Consultants, Inc.; and (5) God Bless Kate and Jack Fantetti 2002. The parents who submitted these latter tiles revised their applications to remove all religious reference and the school subsequently approved these tiles.

Mrs. Seidman, however, refused to alter her message. Subsequently, the Seidmans obtained counsel. On January 13, 2003, the Seidmans submitted a second application requesting a single tile bearing the inscription, "In God We Trust, the Seidman Family." In February of 2003, the application was accepted by the school and a tile bearing the requested message was installed with the other accepted tiles.

On March 10, 2003, the Seidmans filed a Complaint in the United States District Court for the District of Arizona. The Seidmans allege that the Defendants, Paradise Valley School District and numerous other defendants employed by the School District, violated their federal and state constitutional rights, as well as Ariz.Rev. Stat. Ann. (A.R.S.) §§ 41–1493–1493.02 (West.2004).

On February 20, 2004, the Plaintiffs filed a Motion for Summary Judgment on their claims. On April 5, 2004, the Defendants filed a Response and Cross–Motion for Summary Judgment.

## II. LEGAL STANDARD AND ANALYSIS

The standard for summary judgment is set forth in Rule 56(c) of the Federal Rules of Civil Procedure. Under this rule, summary judgment is properly granted when: (1) no genuine issues of material fact remain; and (2) after viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288–89 (9th Cir.1987).

The moving party bears the burden of demonstrating that it is entitled to summary judgment. *Mur–Ray Mgmt. Corp. v. Founders Title Co.*, 169 Ariz. 417, 819 P.2d 1003, 1005 (9th Cir.1991). If the moving party makes a prima facie showing that no genuine issue of material fact exists, the burden then shifts to the opposing party to produce sufficient competent evidence to show that a triable issue of fact does remain. *Ancell v. Union Station Assocs., Inc.*, 166 Ariz. 457, 803 P.2d 450, 452 (9th Cir.1990).

The Court must regard as true the non-moving party's evidence, if it is supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548, 91 L.Ed.2d 265; *Eisenberg*, 815 F.2d at 1289. However, the non-moving party may not merely rest on its pleadings, it must produce some significant probative evidence tending to contradict the moving party's allegations and thereby creating a material question of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986) (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968).

Both parties argue that they are entitled to summary judgment in their favor on the Plaintiff's claims of free speech, free exercise, establishment clause violations. Additionally, the Plaintiffs argue that, as a matter of law, the Defendants' policy is unconstitutionally vague. The Defendants argue that the individual defendants named in the action are entitled to qualified immunity.

Despite the fact that both parties have moved for summary judgment asserting their respective positions in this case, and attached numerous documents in support thereof, the parties have also jointly filed an Amended Stipulation of Facts. The parties are in agreement with respect to the essential facts that give rise to this lawsuit. The issues that the parties present to the Court are entirely legal in nature. Accordingly, there is no question of fact that would preclude the entry of summary judgment in this case.

### A. Plaintiffs' First and Sixth Claims for Relief (Free Speech)

Before turning to a discussion of the substantive issues, the Court must decide whether to address the claims asserted under the Arizona Constitution or those asserted under the United States Constitution.

Generally, federal courts defer to state courts on matters of state constitutional law where state court construction of an unclear or unambiguous matter might make ruling on federal issues unnecessary. *Ellis v. City of La Mesa*, 990 F.2d 1518, 1522 (9th Cir.1993). Here, however, the Court perceives no special circumstances

warranting abstention. *Id.* (discussing abstention on matters of state constitutional law).

■ When state and federal constitutional provisions are "coextensive," federal courts decide the federal constitutional claims because doing so will also dispose of the state constitutional claims. *See Los Angeles County Bar Ass'n v. Eu,* 979 F.2d 697, 705 n. 4 (9th Cir.1992). However, if the state and federal constitutional provisions are not coextensive and the state constitution actually gives more protection than the federal constitution, the court must decide validity under the state constitution first to avoid unnecessarily addressing federal constitutional claims. *See, e.g., Ellis,* 990 F.2d at 1524.

In this case, because Arizona's Constitution does not confer more protection to the Plaintiffs with respect to the claims alleged, the Court will proceed by analyzing the Plaintiffs' claims under the United States Constitution.[1]

The extent to which the government may limit speech that is protected by the First Amendment depends in large part upon the nature of the forum. Thus, the Court's initial task is to determine the nature of the forum at issue in this case.

The Plaintiffs argue that, by soliciting members of the community to purchase tiles inscribed with personalized messages to hang on the elementary school hallway walls, the Defendants created a designated public forum open to private speech. The Defendants, on the other hand, argue that this case not only involves a non-public forum, but that the speech involved is school-sponsored rather than private

speech. They further argue that assuming the Court finds that this case does involve private, as opposed to school-sponsored speech, the Court should also find that the forum created was only a limited public forum.

### 1. Type of Forum

Forum analysis divides government property into three categories: (1) public fora; (2) designated public fora; and (3) nonpublic fora. *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.,* 196 F.3d 958, 964 (9th Cir.1999). A "public forum" is a place, such as a sidewalk or a park, that has been traditionally open for public expression. *Id.* A "designated public forum" is created when the government intentionally opens a nontraditional forum to public discourse. *Id.* A "limited public forum" is a type of non-public form that the government has intentionally opened to certain groups or to certain topics. *DiLoreto,* 196 F.3d at 964.

■ If the forum is "public," such as a traditional or designated public forum, speakers can be excluded only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest. *Hopper v. City of Pasco,* 241 F.3d 1067, 1074 (9th Cir.2001). If, on the other hand, the forum is "non-public," such as a "limited public forum," the government is free to restrict access as long as the restrictions are reasonable and are not an effort to suppress expression merely because the government disagrees with the speaker's viewpoint. *Id.* In this case, the relevant

---

1. The Arizona Constitution extends free speech rights to cover not only speech limitations imposed by the government but also speech limitations imposed by other sources, *State v. Evenson,* 201 Ariz. 209, 33 P.3d 780, 789 n. 15 (Ct.App.2003). Arizona's constitution is also arguably broader in its protection

of non-verbal expression. *See Empress Adult Video and Bookstore v. City of Tucson,* 204 Ariz. 50, 59 P.3d 814, (Ct.App.2003). This case does not involve the type of situation that would invoke the greater protections of Arizona's Constitution.

"forum" is the school's "Tiles for Smiles" program.

■ In considering whether a designated public forum has been created, the Court must look to "the policy and practice" of the government, the "nature of the property and its compatibility with expressive activity," and whether or not the forum was "designed and dedicated to expressive activities." *Hills v. Scottsdale,* 329 F.3d 1044, 1049 (9th Cir.2003); *DiLoreto,* 196 F.3d at 965; *accord Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 802, 105 S.Ct. 3439, 3439, 87 L.Ed.2d 567 (1985).

The Court must also examine the selectivity with which the forum was open to particular forms of expression. *Hopper,* 241 F.3d at 1078. The more restrictive the criteria for admission and the more control that is placed on access to the forum, the less likely it is that the forum will be deemed a designated public forum for First Amendment purposes. *Id.*

■ Additionally, when a forum involves school facilities, it may be deemed a public forum only if school authorities have "by policy or by practice" opened the forum "for indiscriminate use" by the general public or some segment of the public. *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 267, 108 S.Ct. 562, 568, 98 L.Ed.2d 592 (1988) (internal quotation omitted); *DiLoreto,* 196 F.3d at 966; *Planned Parenthood. v. Clark County Sch. Dist.,* 941 F.2d 817, 822 (9th Cir.1991). If the facilities have been reserved for other intended purposes, communicative or otherwise, no public forum has been created. *Hazelwood Sch. Dist.,* 484 U.S. at 267, 108 S.Ct. at 568; *Planned Parenthood,* 941 F.2d at 822.

■ The parties agree that the "Tiles for Smiles" program was a school authorized fund-raising event. The "Tiles for Smiles" application form states that funds

from the program would be used to purchase school equipment (sunshades). The parties have also stipulated that the tiles were intended to be installed permanently in Pinnacle Peak Elementary School's main hallway. They agree that the "Tiles for Smiles" application forms explicitly reserve the right to make minor modifications to the messages as necessary. Although the Plaintiffs take issue with the vagueness of the school's reservation of its editorial rights, they do not dispute that the "Tiles for Smiles" program was also subject to an unwritten policy that required exclusion of any and all controversial messages.

The parties do not dispute, and the evidence suggests, that the tile applications were in fact screened and that messages deemed to be controversial—including the Plaintiffs' messages—were rejected and the submitting parties were asked to submit modifications to bring the messages in compliance with the policy. The parties further agree that only the accepted tiles were installed for permanent display in the main interior hallway of Pinnacle Peak Elementary School.

These factors do not suggest a "clear intent" by the school district to open the forum to public discourse or for "indiscriminate" use. In fact, these factors all suggest an intent by the school to maintain editorial control over the tile inscriptions. *See Planned Parenthood,* 941 F.2d at 823–24 (finding the school district's reservation of its right to control the content in the forum the most persuasive evidence of the school district's intent with respect to the nature of the forum). Additionally, the nature and location of the forum—permanent installation of inscribed tiles within the main hallway of a public elementary school—and its incompatibility with unbridled expressive activity by the general public counsels this Court against finding

that the school district created a designated public forum in this case. *Hills,* 329 F.3d. at 1049.

The Court rejects the Plaintiffs' contention that the "Tiles for Smiles" program was a designated public forum. Thus, the Court must now decide whether the program constituted private speech in a limited public forum or school-sponsored speech.

■ School-sponsored speech is any speech or speech-related activity that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. *LaVine v. Blaine School Dist.,* 257 F.3d 981, 989 (9th Cir. 2001). The "imprimatur concept" merely means that the speech is "so closely connected to the school that it appears that the school is somehow sponsoring the speech." *E.g., Fleming v. Jefferson County Sch. Dist.,* 298 F.3d 918, 925 (10th Cir. 2002). Schools may exercise editorial control over school-sponsored speech so long as its actions are reasonably related to legitimate pedagogical concerns. *Hazelwood Sch. Dist.,* 484 U.S. at 270–71, 108 S.Ct. at 569–70; *Cal. Teachers Ass'n v. State Bd. of Educ.,* 271 F.3d 1141, 1149 (9th Cir.2001). "Pedagogical" merely indicates that the activity is "related to learning." *E.g., Fleming,* 298 F.3d at 925.

■ *Hazelwood School District v. Kuhlmeier* constrains the forum analysis by requiring that courts focus on the unique attributes of the school environment and recognize the broadly articulated purposes for which school facilities may properly be reserved. *DiLoreto,* 196 F.3d at 966 (discussing *Hazelwood*) (internal quotations omitted). Thus, the courts must take into account the school's legitimate pedagogical concerns, such as respecting audience maturity, disassociating itself from speech inconsistent with its educational mission, and avoiding the appearance of endorsing views, no matter who the speaker is. *Id.*

■ The Plaintiffs argue that *Hazelwood* is inapplicable here because the speech at issue in this case was invited into the forum by the school district and was the speech of community members not students or the school itself. Although the facts of *Hazelwood* dealt with student expression, its holding and rationale were not limited solely to student expression. *See Planned Parenthood,* 941 F.2d at 827 ("we are not persuaded by Planned Parenthood's argument that the nature of the speech at issue here, advertisement from an outside entity rather than student speech, places this case beyond the reach of *Hazelwood*").

As noted by the Ninth Circuit in *Planned Parenthood,* when the Supreme Court in *Hazelwood* spoke of school-sponsored speech, it remarked on a school's ability to regulate reasonably the speech "not only of students, but also of teachers, and other members of the school community." *Planned Parenthood,* 941 F.2d at 827. This case involves speech that is taking place within the school building itself. The audience—the students of Pinnacle Peak elementary school—remains the same whether the source for the speech "is from inside the school or outside, or is paid or free." *Id.* Therefore, the school still retains the same pedagogical concerns, such as respecting audience maturity, disassociating itself from speech inconsistent with its educational mission, and avoiding the appearance of endorsing views, no matter who the speaker is. *Id.*

The Plaintiffs also argue that the "Tiles for Smiles" program cannot be school-sponsored speech because the program was not part of the school's "curriculum" as defined by the court in *Hazelwood.* In support of their argument, the Plaintiffs point out that the "Tiles for Smiles" program was administered by the PTO rather than faculty members, and that the pro-

gram was a fund raising event and was not designed to impart any particular knowledge or skill to the student audience.

The Ninth Circuit has interpreted *Hazelwood's* concept of "curriculum" broadly:

> Pointing to the need of educators to maintain control over the school curriculum" the Court in *Hazelwood* used a "broad definition of curriculum," which it said encompassed "school-sponsored publications, theatrical productions, *and other expressive activities that students, parents and members of the public might reasonably perceive to bear the imprimatur of the school.*"

*Burch v. Barker*, 861 F.2d 1149, 1158 (9th Cir.1988) (emphasis added).

The "Tiles for Smiles" program was undisputedly a school-sponsored event, undertaken for a primarily educational purpose (fund raising for school playground equipment). The audience and activity was undisputedly school-related. Thus, although not a part of the schools written "curriculum," the program was intended to serve a pedagogical interest. Also, as already discussed above, the evidence indicates that the school attempted to retain and exercise editorial control over tile messages in order to maintain control over the forum's content.

The Court rejects the Plaintiffs' contention that *Hazelwood* is inapplicable to this case because the Tiles for Smiles program was not a part of the school's instructional curriculum. *See Planned Parenthood*, 941 F.2d at 824–25, n. 10 (*Hazelwood* test also applies to school-sponsored athletic programs despite the fact that they are not a part of the course curriculum). All parties in the case agree that the tiles were intended as a permanent installation within the main interior hallway of Pinnacle Peak Elementary School. Specifically, the flyers state that the tiles were to be inlaid throughout the school's "central corridor hallway, meandering from the front lobby to the back doors." The applications solicit the purchaser to "[i]mmortalize your child or family" and to "[b]ecome a permanent part of Pinnacle Peak Elementary," a "permanent part of the bricks and mortar" of the school. Clearly, the Tiles for Smiles Program was an expressive activity that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. Thus, the Court finds that these factors bring this case within *Hazelwood's* "broad definition of curriculum." *Burch*, 861 F.2d at 1158.

Although some of the responsibility of the "Tiles for Smiles" program may have been administered through the PTO, it is uncontradicted that the program was authorized by the school district as a fundraising event. Uncontradicted evidence demonstrates that funds for the program would be used to purchase school equipment. Given the purpose of the forum, the restrictions maintained over it, and that the tiles were intended as a permanent fixture of the interior of the elementary school's main hallway, students and members of the public could have reasonably concluded that the messages on the tiles had the implicit approval of the school, and thus, bear the school's imprimatur. Accordingly, the court concludes that the "Tiles for Smiles" program involved school-sponsored speech.

### 2. Viewpoint Discrimination

The Defendants argue that they are entitled to summary judgment because restrictions on school-sponsored speech do not violate the First Amendment as long as they are reasonably related to the school's mission with respect to the forum—in this case, to raise funds for the school while avoiding controversy and maintaining a position of neutrality.

The Plaintiffs, on the other hand, argue that they are entitled to summary judg-

ment because even school-sponsored speech must be applied in a viewpoint neutral manner. They argue that but for their religious viewpoint, the Seidmans' messages would have been permissible within the purpose of the forum. In support of their proposition they rely primarily on *Hills v. Scottsdale*, 329 F.3d at 1051 (viewpoint discrimination is not permissible when it is directed at speech otherwise falling within the forum's limitations), and *Tong v. Chicago Park Dist.*, 316 F.Supp.2d 645, 654–658 (N.D.Ill.2004) (holding that the message "Jesus is the cornerstone" was within the "buy a brick" program's permissible subject matter which included "commemorative messages" and that to exclude it solely on the basis of religious content constituted impermissible viewpoint discrimination).

The Defendants argue that because it excluded all controversial subjects, including all religious topics, it only excluded a category of speech and did not discriminate on the basis of viewpoint. They further argue that content regulation is appropriate in the elementary school context in order to preserve the purpose of the forum and maintain the school's educational mission. The Defendants point out that *Hills v. Scottsdale*, the case relied upon by the Plaintiffs, involved private speech in a limited public forum. They argue that there is no precedent for applying *Hills'* viewpoint analysis to school-sponsored speech that takes place on school property. They also argue that the Plaintiffs' speech, by its very nature, did not fit within the purpose of the forum because it was controversial. In support of their arguments, the Defendants rely primarily on *Fleming v. Jefferson County Sch. Dist.*, 298 F.3d 918 (10th Cir.2002) (concluding that *Hazelwood* does not require educators' restrictions on school-sponsored speech to be viewpoint neutral and finding that the school's exclusion of religious symbols on tiles installed throughout a high school

hallway did not violate the First Amendment because it was reasonably related to legitimate pedagogical concerns).

Viewpoint discrimination that is directed at speech falling within a forum's limitations is impermissible. *Hills*, 329 F.3d 1044, 1051. The Court has found no authority allowing viewpoint discrimination when the speech merely bears the imprimatur of the school and the forum is located on school property. Accordingly, the Court rejects the Defendants' contention that application of a viewpoint neutrality analysis to topics that are otherwise permissible within the scope of a forum is inapplicable to school-sponsored speech that takes place on school property.

The circuits are split as to whether *Hazelwood* requires regulation of school-sponsored speech to be viewpoint neutral. *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1011 n. 9 (9th Cir.2000) (citing cases). The Ninth Circuit has held that there is no viewpoint neutrality requirement *when the school district itself is the one that is speaking. Id.* at 1011, 1013. However, if the speech at issue *merely bears the school's imprimatur*, Ninth Circuit precedent requires the regulations imposed to be viewpoint-neutral. *Downs*, 228 F.3d at 1010–11 (stating that despite the absence of a viewpoint neutrality discussion in *Hazelwood*, the Ninth Circuit has incorporated viewpoint neutrality analysis into school sponsored speech cases); *Planned Parenthood*, 941 F.2d at 829 (holding that the "reasonableness" inquiry required to justify school authorities to regulate speech under *Hazelwood* requires viewpoint neutrality).

This case does not involve a situation where the *school itself is speaking*, it involves a situation where the speech at issue, because of its location and nature, merely *bears the school's imprimatur*. Therefore, the Court must apply a view-

point neutrality analysis. Accordingly, although the *Fleming* case relied upon by the Defendants is factually similar to this case in some respects, this Court must diverge from the Tenth Circuit's decision to the extent that it relies upon the proposition that school-sponsored speech does not require viewpoint neutrality.

When the school opens its doorways to a school-sponsored activity that allows community expression on various topics, grey areas such as the Seidmans' "God Bless" tiles place school officials squarely between the proverbial "rock and a hard place." The "rock" is twofold: (1) the school district has an interest in maintaining an educational environment and ensuring that students are not exposed to material which may be inappropriate to their level of maturity or disruptive to the school's mission; and (2) the school has an interest in avoiding Establishment Clause violations and ensuring that views of individual speakers are not erroneously attributed to the school district. The "hard place" is the freedom of speech that is required by the First Amendment when the school opens its forum to secular topics that can arguably be presented from a religious point of view. Regardless of whether the school excludes—or allows—statements of expression that have not yet been defined as either clearly religious nor clearly secular under existing precedent, it undoubtedly opens itself up to litigation by Americans eager to exercise their constitutional rights.

 The Defendants are correct that content-based discrimination is, in some instances, permissible in order to preserve the purpose of the forum. *Hills*, 329 F.3d at 1051. However, the Court must look not only at what the policy excludes from the forum but also what the policy allows in the forum. The fact that a policy broadly excludes religion as a category of speech does not make its applica-

tion viewpoint neutral if it discriminates on the basis of viewpoint by permitting the presentation of views dealing with the same subject and excluding those presented from religious standpoint. *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 385, 113 S.Ct. 2141, 2143, 124 L.Ed.2d 352 (1993). It is impermissible viewpoint-based discrimination to exclude speech on a topic that is "otherwise permissible" within the scope of the forum merely because it is presented from a religious point of view. *Hills*, 329 F.3d at 1051.

The question of whether the Defendants in this case engaged in viewpoint discrimination when it rejected the Seidmans' messages depends upon whether that speech at issue in the case falls within the included subject matter to which the "Tiles for Smiles" program was opened. *See Hills*, 329 F.3d at 1051. Thus, the Court must look not only at the underlying purpose of the "Tiles for Smiles" program, but also at the type of messages that were allowed into the forum and whether the Seidmans' rejected messages merely presented an "otherwise permissible" topic from a religious point of view. *See id.*

The parties all agree that the underlying purpose of the "Tiles for Smiles" Program was to raise funds for the school district. It undisputed that the school intended to limit the forum by allowing only messages that avoid controversy and maintain a position of neutrality. However it is also undisputed that there was no specific policy that described what sort of messages were permissible within the forum.

The Defendants presented evidence which suggests that the original expectation of school officials was that the tiles would be noncontroversial inscriptions recognizing students and that they would merely bear the inscription of a name and perhaps a date but would not convey any

messages or ideas. The Defendants argue that the messages that were accepted were at most intended to recognize or motivate students and that they fit within the scope of the forum because they were not debatable or subject to competing points of view.

Although many of the tiles did merely bear a name and a date, the undisputed evidence shows that many of the accepted tiles also conveyed "ideas or expression." For example, the following inscriptions were all deemed permissible within the scope of the forum: (1) Bless Our School; (2) Honor and Respect All; (3) In Memory of Abby Meyer; (4) Knowledge is Power Breanna & JJ; (5) No Question is Wrong; (6) Many Promises to Keep Jean–March Puch 2002; (7) Miles to Go Before I Sleep R Frost JM Punch; (7) Keven Murphy Live Free; (8) Quincy Murphy We Bless America; (9) Horses R Family; (10) Let Freedom Ring! Olivia Whitten; (11) The Shortest Distance Between Two People is a Smile; (12) the Zuckerman Family Wishes You Peace; (13) Site Consultants, Inc. Children Are Gifts; (14) An Apple for the Teacher—March Puch; (14) Be Proud of the Red White and Blue; (15) In God We Trust; (16) United We Stand; (17) Savannah Day 2002–2003 "Believe"; (18) Have a Great Day The Stowell Family; (19) The Phelps Family Peace on Earth; (20) Health, Peace, Success The Tedesco Family; (21) Mom and Dad Russo Learn, Love, Laugh; (22) Mary Kate Greer Gr 1 Go Red White & Blue! (23) Southwest Otolaryngology; and (24) The Copy Club Supports Learning at PPE.

As revealed by the examples above, the accepted inscriptions extended beyond mere recognition of students. The tile application forms broadly encouraged participants to "[i]mmortalize [their] child or family . . . with a special message of [their] choosing." The accepted tiles included memorial statements, statements of personal belief, expressions of patriotism, recitations of poetry, and even what appear to be business advertisements. Statements such as "Horses R Family," "Children are Gifts," "Live Free," "We Bless America," "United We Stand," "Peace on Earth," "Let Freedom Ring," "Southwest Otoloryngology," and "In God We Trust," clearly contain personal beliefs, ideas and expression that go beyond mere recognition or motivation of students.

Certainly, a person could have a differing viewpoint on whether children should be encouraged to "Live Free" or whether horses should be considered "family." And while we may hope that most Americans are patriotic and would seek to instill in their children love and support of our country, expressions such as "United We Stand" and "In God We Trust" are not subjects that are "free from opposing viewpoints." Thus, the Court can only conclude that, because of the lack of criteria defining the scope of the forum, the Defendants created a forum that was broader than it had originally intended.

At the very least, the uncontroverted evidence shows that messages of love, praise, encouragement, and recognition of students were subjects that were permissible within the scope of the forum: (1) Alyssa Torpey 2002 Reach for the Stars; (2) Fly Like an Eagle Ben Ruh 2002; (3) Kacey Milligan Was Here; (4) We Love You Alyssa & Jonathan; (5) On Eagles Wings Michael & Patrick Harlan; (6) Britta & Anders, All Our Love, Mom & Dad; (7) Bless Kate & Jack Fantetti 2002; (8) The Strong Foursome 2002; (9) We 3 Are 1 Christopher Harlig; (10) Aaron Hill 2002 We Love You; (11); Buddy Greer Grade 2 Pinnacle Peak Rocks! (12) School is Cool! Alex Feldman; (13) School Rocks!! Zack Feldman; (14) John Paul Reiners 2002 Go Eagles; (15) Pinnacle Peak Pride Savannah Johnson 2002; (15) Soaring Sky High

Second Grade 2002–2003; (16) Stretch to Reach Your Goals BJ '02; (16) Lennon Miller "Awesome Kid"; (17) Dillon Hopley Soaring to Leadership; (18) The Windsor Fab Five 2002; (19) Dare to Succeed Kaitlyn Nevans; (20) Logan Stewart Believe in Yourself; (21) The Sheridan Boys Go Eagles Go; (22) Hayden Freidman 2002 Love, Mom & Dad; (23) Kianna Day 2002–2003 "Reach"; (24) At School Taylor McCormick; (25) Have a Great Day! The Stowell Family; (26) Climbing to the Peak Bradley Babits 2002; (27) Learning Together Builds Friendship Siera Whitten; Macey Deak Pumpkin Smile; (28) Nicholas Schwartz the Sky is the Limit; (29) Health, Peace, Success The Tedesco Family; (30) Honor and Respect All; (31) Knowledge is Power Breanna & JJ; and (33) No Question is Wrong, etc.

The Seidmans messages, "God· Bless Haley, We Love You Mom and Dad" and "God Bless Quin We Love You Mom and Dad," are clearly messages of love, praise, encouragement, or recognition directed at their children. Thus, the messages appear to be within the subject matter of the forum. The Defendants agree that the sole reason for the exclusion was the fact that the use of the word "God" was perceived to be a religious reference and, therefore, controversial.

When dealing with school-sponsored speech, educators are entitled to exercise greater control to assure that viewers of the expression are not exposed to material that may be inappropriate for their level of maturity and that the views of the individual speaker are not erroneously attributed to the school. *Hazelwood Sch. Dist.*, 484 U.S. at 271, 108 S.Ct. at 570. A policy that excludes controversial materials within an elementary school environment in order to avoid disruptive debate and preserve the school's image of neutrality is certainly a legitimate pedigogical concern. *DiLoreto*, 196 F.3d at 968. However, part of the determination of whether the restriction was constitutional includes an inquiry into whether the policy was imposed in a manner that was viewpoint neutral. *Planned Parenthood*, 941 F.2d at 829.

██ Viewpoint discrimination is a form of content discrimination where the government targets particular views taken by speakers on a given subject. *DiLoreto*, 196 F.3d at 969. There is no viewpoint discrimination where a subject matter is categorically excluded from the forum regardless of the particular stand that the speaker takes on the topic. *See id.* However, a policy broadly excluding religion as a category of speech is not viewpoint neutral if the policy permits the presentation of other views dealing with the same subject but excludes those presenting the issue from a religious standpoint. *Lamb's Chapel*, 508 U.S. at 385, 113 S.Ct. at 2143. A school district cannot exclude a message with underlying religious content when it allows messages on that same subject matter from a secular perspective. *See Hills*, 329 F.3d at 1053.

██ The Seidmans' messages were undisputedly excluded because of the perceived potential for controversy due to the use of the word "God." Likewise, the statements "God Bless our School" and "God Bless Kate and Jack Fantetti 2002", and "God Bless America" were all rejected initially, but the identical statements were deemed acceptable once the word "God" was removed from the statement. Additionally, the Defendants admit that the reason that the "In God We Trust Tile" was accepted was because the word "God," in that context, was not perceived by the school district as having any religious significance. Presumably, under the Defendants' policy, the statement "Bless Haley and Quinn, Love Mom and Dad" would have been permissible.

In this case, the school opened the forum to advertisements, general statements of belief and opinion, words recognizing or memorializing individuals and students. The school also opened the forum to "inspirational" or "encouraging" messages from parents to their children presented from political and secular perspectives but closed the forum to the same type of messages presented from a religious perspective. The Court can only conclude that the School District engaged in viewpoint discrimination by rejecting religious statements on a subject that would have been permissible as within the scope of the forum if presented from a secular point of view. *See, e.g., Tong,* 2004 WL 943446, at *8–11 (holding that the message "Jesus is the cornerstone" was within the "buy a brick" program's permissible subject matter which included "commemorative messages" and that to exclude it solely on the basis of religious content constituted impermissible viewpoint discrimination); *Demmon v. Loudoun County Public Sch.,* 279 F.Supp.2d 689 (E.D.Va.2003) (holding that allegation that Latin cross was excluded from school's walkway of fame which contained inscribed bricks purchased by families of students sufficient to create a question of fact as to whether the symbol had been impermissibly excluded solely on the basis of its religious message; factual question remained with respect to whether the scope of the forum only included expression of school-sponsored interests).

### 3. Establishment Clause Defense

 The Defendants argue that the school has a compelling justification for excluding religious messages in order to avoid a violation of the Establishment Clause. The Defendants point to the fact that the tiles are displayed in the elementary school's main hallway and that the school children are the primary audience, and they argue that exclusion of messages with religious viewpoints are necessary to avoid an Establishment Clause violation.

There is no doubt that compliance with the Establishment Clause is a state interest sufficiently compelling to justify content based-restrictions on speech. *Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 761–62, 115 S.Ct. 2440, 2446, 132 L.Ed.2d 650 (1995). Whether that interest is implicated in this case is another question.

The phrase "God bless" is commonly used in our culture in a number of different contexts. The phrase "God Bless America," has historic and patriotic significance. *See Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. ——, ——, 124 S.Ct. 2301, 2322–27, 159 L.Ed.2d 98 (2004) (O'Connor, J., concurring) (discussing historical and ceremonial deism). Answering a sneeze with the words "God bless you" is a common tradition that is seen as an indication of politeness. "God bless!" is sometimes used, in place of an expletive, to express frustration. And, as in the context of the Seidmans' tiles, the words "God bless" can be used as a general invocation of divine assistance to, or blessing upon a specific individual. One thing is true of all the examples given, including the excluded tiles: use of the words "God bless" refers to religion in only the most general sense. The statements do not exhort any particular faith or identify any particular religion. The Court does not believe that the school district's acceptance of the Seidmans' messages to their children, the "God Bless America" tile, or the "God Bless our School" tile would have created an Establishment Clause violation.

One of the fundamental principles behind the Establishment Clause is that government must not make a person's religious beliefs relevant to his or her standing in the political community by conveying a message that religion or a particular

religious belief is favored or preferred. *County of Allegheny v. Am. Civil Liberties Union,* 492 U.S. 573, 627, 109 S.Ct. 3086, 3119, 106 L.Ed.2d 472 (1989) (O'Connor, J., concurring) (internal citations omitted). Our Supreme Court has allowed the government to refer to, or commemorate, religion in various different contexts so long as the expression does not have the effect of "endorsing" or "advancing" any one particular religion or religious viewpoint. *See Elk Grove Unified Sch. Dist.,* 542 U.S. at ——, 124 S.Ct. at 2321–27 (O'Connor, J., concurring) (discussing the endorsement test and its critical relationship to the Establishment Clause).

Although viewers reading the "Tiles for Smiles" display would likely have seen the display as a school-sponsored activity, even had the tiles at issue in this case been included in the display, a reasonable observer would not have interpreted the individual "God Bless" messages as conveying the idea that any one particular faith, church, creed, or "God" was favored or preferred over another, including a "religion of non-religion."

Additionally, there are notable distinctions between this case and the cases that find that Establishment Clause concerns justify viewpoint regulation. Cases justifying viewpoint discrimination rely, in part, on the coercive environment and proselytizing nature of the speech involved. *See, e.g., Lee v. Weisman,* 505 U.S. 577, 578–79, 112 S.Ct. 2649, 2651–52, 120 L.Ed.2d 467 (1992) (finding that the religious exercise that was a part of high school graduation ceremony was unduly coercive; due to the importance of the event and peer pressure, a student is not free to absent himself from the exercise in any real sense of the term "voluntary"); *Cole v. Oroville Union High Sch.,* 228 F.3d 1092 (9th Cir.2000) (including student's proselytizing speech as part of a graduation ceremony would have

constituted district coercion of attendance and participation in a religious practice because proselytizing, no less than prayer, is a religious practice).

The speech at issue in this case, and the nature in which it was displayed, was not of the nature that would create coercive pressure on the students to participate in religious observance. Nor does this case involve the type of government sponsorship of religion that was present in the cases that justify viewpoint discrimination. *See, e.g., Hills,* 329 F.3d at 1055 (schools do not endorse everything they fail to censor) (internal quotation omitted).

The excluded tiles would have been scattered among a display that undisputedly contained over 360 tiles. All of the excluded messages seem particularly benign in light of the fact that they were directed at particular individuals (sentiments of blessing to Quin and Haley by their parents, to the Fannetti children by their parents, and to "America" by another individual). There is no evidence that the display was designed in such a way as to draw particular attention to the inscriptions at issue, or that students would be in any way compelled to participate in religious observance by virtue of viewing the display and coming across one of the "God Bless" tiles. *See, e.g., Brown v. Woodland Joint Unified Sch. Dist.,* 27 F.3d 1373 (9th Cir.1994) (merely reading, thinking about, or even discussing, religious text poses a much lesser risk of Establishment Clause violation than student participation in a religious exercise).

Although the tiles were installed in the hallway of the school, the evidence shows that the vast majority of the tiles were signed by the bearer or the message, or the person to whom the message was directed at or both. Although the signatures are not the equivalent of an express disclaimer by the school, there is certainly

less danger of a perception of endorsement than if it was not readily apparent that the school did not write the individual messages.

The school district would have been justified in excluding tiles that were proselytizing (attempting to induce someone to convert to a particular faith) or exhorting (language intended to incite and encourage) religious observance. However, it cannot be said that the language "God Bless Quinn, We Love You Mom and Dad" or "God Bless Haley, We Love You Mom and Dad" attempt to incite and encourage readers of the inscription to participate in religious observance or to convert to a particular faith or religious belief.

Unlike the "school prayer" cases, this case does not involve a situation where the school would have been compelling the students to support or participate in religious observance or practice. Assuming the Seidmans' messages had not been rejected, the facts of this case would not amount to government sponsorship of, or coercion to participate in, a particular religious practice.

Although the "Tiles for Smiles" program was on school grounds, the individual tiles contained a large variety of some inscribed message on different topics, some nearly identical to the Seidmans' messages only from a secular viewpoint. Including religious viewpoint on an otherwise permissible subject within the forum is consistent with the school's position of neutrality. *See Good News Club v. Milford Central Sch.*, 533 U.S. 98, 114, 121 S.Ct. 2093, 2104, 150 L.Ed.2d 151 (2001) Moreover, as pointed out in the discussion above, it is required by the First Amendment's guarantee of free speech.

The Defendants have failed to present any precedent that suggests that permitting non-proselytizing text from a general religious perspective on a topic that has already been allowed within the scope of the forum would result in an Establishment Clause violation. The Court finds that the Defendants' interest in avoiding an Establishment Clause violation was not compelling enough to justify exclusion of the Seidman's messages because of their religious viewpoint. *See Good News Club,* 533 U.S. at 112, 121 S.Ct. at 2093.(holding that although the state may in some cases have a compelling interest in avoiding an Establishment Clause violation that may justify content-based discrimination, it is not clear whether a State's interest in avoiding an Establishment Clause violation would justify viewpoint discrimination).

The greater problem facing the school district was not whether the speech at issue in this case would have violated the Establishment Clause but the door that could have been opened by allowing the "God Bless" inscriptions—as benign as they may be.

Had the school allowed tiles inscribed with messages stating that "God Blesses Quinn," would it have also been required to allow an inscription bearing a blessing from Allah? Would it have also been required to allow an inscription stating that "God blesses none, for there is no god?" At oral argument, both counsel for the Plaintiffs and the Defendants answered in the affirmative.

Clearly, the hallways of our public elementary schools are not an appropriate place for such discourse and debate. Nevertheless, the school cannot exclude religious viewpoints on topics that they have already permitted into the forum. Perhaps, in this case, the proverbial "rock and a hard place" was created not because of the "grey" nature of the speech at issue but by the school district's failure to define the scope of the forum with any real degree of specificity.

Because the Court has found that the Defendants policy violated the Plaintiffs'

right to free speech under the First Amendment, it need not separately analyze whether Arizona's Constitution was violated.[2] **Summary Judgment is granted in favor of the Plaintiffs' with respect to the Plaintiffs' First and Sixth Claims for Relief (Free Speech).**

### B. Plaintiffs' Fourth Claim for Relief (Equal Protection)

▆ Under the Equal Protection Clause, like the First Amendment, the government may not grant access to the use of a forum to people whose views it finds acceptable but deny use to those wishing to express less favored or more controversial views. *Police Dept. of Chicago*, 408 U.S. 92, 97, 92 S.Ct. 2286, 2292, 33 L.Ed.2d 212 (1972). In cases such as this case, where the regulated activity is protected by the First Amendment in addition to the Equal Protection Clause, the policy must be narrowly tailored to serve its legitimate objectives. *Id.* at 101, 92 S.Ct. at 2293.

As noted above, schools do have legitimate reasons to selectively regulate controversial subject matter within their hallways. Nevertheless, once a forum is opened up to speaking on a particular topic, a school cannot prohibit others from speaking on the basis that what they intend to say has been spoken from a religious perspective. *Police Dept. of Chicago*, 408 U.S. at 96, 92 S.Ct. at 2290.

While the Defendants have asserted a compelling interest, the Court cannot say that the policy at issue was "narrowly tailored to [its] legitimate objectives." *Police*

*Dept. of Chicago*, 408 U.S. at 101, 92 S.Ct. at 2293. Because the Defendants' policy provided no guidance as to what type of speech was appropriate for the forum, the exclusions in this case were based entirely on the religious content of the expression. The selective restriction that was imposed in this case was far broader than was essential to the furtherance of the stated government objective. Accordingly, **the Plaintiff's Motion for Summary Judgment is granted with respect to the Fourth Claim for Relief (Equal Protection Clause).** *See id.* at 102, 92 S.Ct. at 2293–94.

### C. Plaintiffs' Third Claim for Relief (Due Process/Vagueness)

▆ The Plaintiffs argue that the editorial restrictions governing the "Tiles for Smiles" program violate the due process clause because the policy governing such restrictions is unconstitutionally vague. The crux of the Plaintiffs' argument is that there is no policy other than a verbal prohibition on messages of a "controversial" nature and that such a policy is not specific enough to avoid arbitrary and discriminatory enforcement. The Plaintiffs argue that the term "controversy" provides speculation about the reactions of third parties. The Plaintiffs argue that school officials can come to differing conclusions as to what is prohibited by the policy, and that it could be used to keep virtually any speech in our out of a forum.

In support of their position, the Plaintiffs points to evidence suggesting that the

---

**2.** The Court's above analysis is sufficient to support a finding that the Defendant violated the Plaintiffs' free speech rights under the Arizona Constitution. *Los Angeles County Bar Ass'n*, 979 F.2d at 705 n. 4 (when state and federal rights are coextensive, courts resolve both the state and federal constitutional claims through the discussion of the scope of the federal constitutional right); *see also*

*Phoenix Elementary Sch. Dist. v. Green*, 189 Ariz. 476, 943 P.2d 836 (Ct.App.1997) (citing federal caselaw and applying traditional forum analysis to a First Amendment question within the context of regulating speech within a public middle school, and finding that the schools dress code is content neutral and reasonably related to a legitimate pedagogical purpose).

Defendants rejected all religious messages as "controversial" with the exception of the message "In God We Trust." The Plaintiff further provide evidence that at least one school official expressed the opinion that "unspecific" religious messages such as the Seidman's fell within "gray area," but that specific religious references were clearly excludable as controversial.

The Defendants argue that the School District's policy withstands a vagueness challenge. They argue that the prohibition against "controversial" messages is not unconstitutionally vague because the school officials and members of the public are able to make the determination whether submissions violate this policy merely by exercising common sense, particularly in light of the fact that the School District considered all religious material "controversial." The Defendants argue that the policy was understood both by the school officials and the public. In support of their position, they refer to the same evidence provided by the Plaintiff—that of the approximately 360 tiles submitted all messages with "religious content" were excluded under the policy. The Defendants also provide multiple documents setting out school's written policies requiring staff to maintain a position of neutrality regarding religion, and encouraging staff to refrain from either advocating or discouraging, any type of personal religious belief.

The fact that the policy at issue in this case was not committed to writing does not render the policy unconstitutionally vague. *Families Achieving Indep. & Respect v. Nebraska Dep't of Soc. Servs.*, 111 F.3d 1408, 1415 (8th Cir.1997); *Lebron v. Nat'l R.R. Passenger Corp.*, 69 F.3d 650, 658 (2d Cir.1995). An unwritten policy can become "explicit" through well-established practice. *Families Achieving Indep. & Respect*, 111 F.3d at 1415. However, in order to survive a vagueness challenge the unwritten policy must be sufficiently well-

established—that is consistently applied and understood—so as to provide standards for those who apply the policy and prevent avoid arbitrary and discriminatory enforcement. *See id.; Lebron*, 69 F.3d at 658; *accord U.S. v. Makowski*, 120 F.3d 1078, 1080 (9th Cir.1997) (due process requires that the policy at issue in this case provide sufficient clarity as to allow persons of ordinary intelligence a reasonable opportunity to know what is prohibited and to avoid arbitrary and discriminatory enforcement).

The parties stipulate that Pinnacle Peak Elementary School has an overall policy requiring neutrality on controversial subjects and requiring avoidance of the appearance of endorsement of any particular viewpoint on topics that are considered by the school to be controversial. They stipulate that, even prior to the "Tiles for Smiles" Program, the school district had in the past considered religion to be a "controversial" subject.

One of the complexities of this case arises not from the nature of the speech at issue but with the school district's failure to define the scope of the forum with any real degree of specificity. Based on the evidence submitted by both parties, it appears that the school district did have a consistent practice *in other contexts* of refraining from either advocating or discouraging any type of personal religious belief in order to maintain a position of neutrality.

What makes the facts of this case problematic, and perhaps somewhat unusual, is that the only established practice that was in place to guide application of the unwritten policy of excluding "controversial" material admittedly led the Defendants to the conclusion that the school's policy of neutrality requires them to exclude an entire category of speech -religious speech—without any

criteria defining the scope of the forum or the permissible topics of discussion. As noted previously, public schools do have legitimate concerns for avoiding controversy on topics, including religion, that might be disruptive to the school's purpose and the educational environment. *Hazelwood,* 484 U.S. at 272, 108 S.Ct at 570. However, schools cannot just broadly exclude all religious speech without first considering the scope of the forum that they have created.

The failure of officials to consider the scope of the forum they were creating as they reviewed tiles for inclusion in the program led to the inconsistent result that "In God We Trust" (our Nation's motto) was deemed permissible within the scope of the forum but "God Bless America" (a song with patriotic significance akin to the our National Anthem) was excluded as religious and, therefore, controversial. This leads the Court to question: would the school have rejected a statement that "God Enriches"? Would the school's opinion change if it knew that this statement is the official motto of the State of Arizona?

When asked at oral argument if, because "Horses R Family" was permitted, would "I love my fur coat" also be permitted, counsel for the Defense answered in the affirmative. However, the idea of wearing fur is a well known point of controversy among animal welfare enthusiasts. Expressions of patriotism are arguably debatable, yet "Let Freedom Ring" and "Live Free" were allowed into the forum. "Bless America" was considered permissible; however, would "Bless President Bush" have been permitted?

The Court understands the great difficulty public schools face in trying to maintain the delicate balance between the Free Speech and the Establishment Clauses. However viewpoint discrimination cannot be prevented unless: (1) the scope of the forum has been decided before the commu-nity is solicited to present speech for display within the forum; and (2) the school provides definite standards for those who are reviewing the speech in order to determine whether it is permissible within the scope of the forum. *See, e.g., Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972).

Due process requires that the policy at issue in this case provide sufficient clarity as to allow persons of ordinary intelligence a reasonable opportunity to know what is prohibited and to avoid arbitrary and discriminatory enforcement. *Grayned,* 408 U.S. at 109, 92 S.Ct. at 2299; *·U.S. v. Makowski,* 120 F.3d 1078, 1080 (9th Cir. 1997).

The term "controversial," standing alone, is not unconstitutionally vague. The term "controversial" is broadly defined as anything relating to or arousing controversy. Merriam Webster's Collegiate Dictionary (10th ed.1993). "Controversy" is the expression of opposing viewpoints, and the term broadly encompasses anything that can be disputed or opposed through the process of reasoning. *Id.* Certainly this definition states the common sense, lay understanding of the term.

Given the particular context in which it is applied, a policy that delineates its reach in "words of common understanding" generally provides fair notice to those at whom it is directed. *Grayned,* 408 U.S. at 112, 92 S.Ct. at 2294. Particularly when that context is a public school. *Id.* The Court cannot say that the policy in this case was unconstitutionally vague. It was, however, applied in a viewpoint discriminatory manner.

**Summary Judgment is granted in favor of the Defendants with respect to the Plaintiffs' Third Claim for Relief (Vagueness).**

D. Plaintiffs' Second and Seventh Claims for Relief (Free Exercise)

■ The Plaintiffs argue that the policy in this case violates their First Amendment right to free exercise of religion. The asserted basis for the Plaintiffs' free exercise claim is that the district's policy "discriminates" against their religious beliefs by excluding conduct that they undertook for religious reasons.

The Free Exercise Clause recognizes the right of every person to choose among types of religious observance free of government compulsion. *Grove v. Mead Sch. Dist.*, 753 F.2d 1528, 1533 (9th Cir.1985). To establish a violation of the clause, a litigant must show that the challenged government action has a coercive effect that operates against the litigant's practice of his or her religion. *Id.* Relevant in this analysis are the extent of the burden upon the exercise of religion, and the existence of a state interest justifying that burden. *Id.*

However, this case does not involve religious activity as contemplated by the Free Exercise Clause. The Court need not examine whether the asserted state interest justifies the "burden" imposed, because the Plaintiffs in this case have failed to assert even an incidental burden on the exercise of their religion. The Court does not question the Plaintiffs' assertion that they are Christians who sincerely believe that their Christian faith is inseparable from everyday life. Nonetheless, the Plaintiffs' allegation that their messages of encouragement were excluded because they are religious is not sufficient to create a Free Exercise Clause violation, even if this Court were to assume that strict scrutiny applies. Proselytizing, preaching, and prayer *are* protected by the Free Exercise Clause. *See, e.g., Texas Monthly v. Bullock*, 489 U.S. 1, 22–33, 109 S.Ct. 890, 903, 103 L.Ed.2d 1 (1989). However, the Seidmans' messages do not rise to such a level.

The Plaintiffs' allegations, even assuming their veracity, do not amount to a burden on the free exercise of their religion. *Graham v. Comm'r of IRS*, 822 F.2d 844, 851 (9th Cir.1987) (without a presumption of unconstitutionality, the interference with one's practice of religion "must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine"). There is simply no evidence that the policy in this case (although unconstitutional for other reasons) prevented the Plaintiffs from participating in the mandates of their Christian faith or burdened their religion in any way.

None of the authorities cited by the Plaintiffs suggest that the result should be any different under the Plaintiffs' state law claim. The Plaintiffs have failed to show a substantial burden on the exercise of their religion as required by A.R.S. § 41–1493.01.[3] Therefore, summary judgment will be granted in favor of the Defendant on the Plaintiffs' Second Claim and Seventh Claims for relief (free exercise).

**Summary Judgment is granted in favor of the Defendants with respect to the Plaintiffs' Second and Seventh Claims for Relief (Free Exercise).**

---

**3.** The statute provides, in relevant part, "the government shall not *substantially burden* a person's exercise of religion even if the burden results from a rule of general applicability." A.R.S. § 41–1493.01(B) (emphasis added). The government may only *substantially burden* a person's free exercise of religion if it demonstrates that the burden is "the least restrictive means" necessary "in furtherance of a compelling governmental interest." *Id.* at 1493.01(C)(1) and (2) (emphasis added). The statute explicitly states that the term "substantially burden" is included in the statutory language to ensure that the statute is "not triggered by trivial, technical or de minimis infractions." *Id.* at 1493.01(E).

### E. Plaintiffs' Fifth Claim for Relief (Establishment Clause)

The Plaintiffs claim that the "Tiles for Smiles" program violates the Establishment Clause by establishing a "religion of secularism." To withstand an Establishment Clause challenge a policy must: (1) have a secular purpose; (2) have a primary effect that neither advances nor inhibits religion; and (3) not foster excessive entanglement with religion. *Grove,* 753 F.2d at 1534; *Droz v. Comm'r of IRS,* 48 F.3d 1120, 1124 (9th Cir.1995).

■ Although the Establishment Clause is most generally invoked to protect against government endorsement of religion, it is equally applicable to claims that the government is hostile to religion. *See Sch. Dist. of Abington Township v. Schempp,* 374 U.S. 203, 225, 83 S.Ct. 1560, 1573, 10 L.Ed.2d 844 (1963). The government cannot establish a religion of secularism in the sense of affirmatively showing hostility to religion, opposing religion, or showing preference to those who believe in no religion over those who do believe in a religion. *Sch. Dist. of Abington Township,* 374 U.S. at 225, 83 S.Ct. at 1573.

■ The Plaintiffs in this case have presented no evidence that the Defendants affirmatively opposed religion, were hostile to religion, or showed preference for those who do not believe in religion. It undisputed in this case that the purpose of the policy's exclusion of controversial material was to maintain the district's position of neutrality on issues of controversy. It does not follow that, because the Defendants excluded religious messages in the hopes of avoiding controversy, the policy's primary purpose was anti-religious in nature, hostile toward religion, or promoted the idea that one should not believe in religion.

Neutrality is the absence of a preference for either side of a particular viewpoint. A school's desire to exclude religious expression in order to maintain a position of neutrality with respect to religion does not evidence hostility toward religion or a desire to promote or create a religion of secularism. The Defendants non-viewpoint neutral exclusion of the "God Bless" messages violated the Seidmans free speech rights because the Defendants, perhaps mistakenly, opened the forum up to a broad spectrum of speech on similar topics that were addressed from secular viewpoints. Nevertheless, the intent behind the exclusion of the messages is undisputed in this case. The policy's primary purpose in this case neither advances nor inhibits religion.

The Plaintiff has failed to raise a question of fact that the policy, or exclusion in this case, constitutes the establishment of a secular religion or theme of anti-religious endorsement. Additionally, the Plaintiffs have failed to present any evidence or precedent to support a finding that the policy of excluding controversial messages, including religious messages, fosters excessive entanglement with religion. Accordingly, **Summary Judgment is granted in favor of the Defendants with respect to the Plaintiffs' Fifth Claim for Relief (Establishment Clause).**

### F. Individual Defendants' Entitlement to Qualified Immunity

■ The Defendants contend that the Individual Defendants, Dr. Cianfarano, Dr. Krebs, and Ms. Ashby, are entitled to summary judgment on the ground that they are entitled to qualified immunity as public employees.

The doctrine of qualified immunity protects government officials from liability for civil damages to the extent that their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Newell v. Sauser,* 79 F.3d 115, 117 (9th

Cir.1996). When government officials assert the defense of qualified immunity, the court must determine whether the plaintiff has alleged a constitutional deprivation and, if so, whether the right was clearly established at the time of the violation. *Cole,* 228 F.3d at 1101. And finally, the ultimate determination is whether a reasonable official could have believed the particular conduct at issue was lawful. *Newell,* 79 F.3d at 117.[4]

The Court has concluded that the Plaintiffs in this case have established a deprivation of their right to freedom of speech. Therefore, the Court's task now is to determine whether the right was clearly established at the time of the violation.

To be clearly established, the law must be "sufficiently clear that a reasonable official would understand that what he or she is doing violates that particular right." *Newell,* 79 F.3d at 117. If the government official could have reasonably believed that his conduct was lawful, the officer is immune from suit even if a constitutional violation has occurred. *Id.* at 118.

Government officials are imputed to have knowledge of constitutional developments at the time of the alleged constitutional violation, including all available case law. *Deposit Ins. Corp.,* 940 F.2d at 477. If there is no binding precedent on the issue, the government officials are imputed knowledge of the relevant decisions of state courts, other circuits, and district courts. *See Tribble v. Gardner,* 860 F.2d 321, 324 (9th Cir.1988).

The alleged violation in this case took place between August of 2002, when the Seidmans' submitted their tile application and March 6, 2002, when the tiles were repeatedly rejected and the school asked the Seidmans to alter the inscriptions to remove any religious expression. It was clearly established at the time of the violation that restrictions on speech in the context of a limited public forum must be both viewpoint neutral and reasonable in light of the purpose served by the forum. *Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 829, 115 S.Ct. 2510, 2516, 132 L.Ed.2d 700 (1995). The notion that speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint was also a well-settled principle of law at the time of the alleged violation in this case. *Good News Club,* 533 U.S. at 108, 112, 121 S.Ct. 2093, 150 L.Ed.2d 151 (decided in 2001). Additionally, it had also been clearly established that, in the Ninth Circuit, the viewpoint neutrality analysis applies to nonpublic forum, school-sponsored speech as well as private speech in a limited public forum. *Downs,* 228 F.3d at 1010 (decided in 2000); *Planned Parenthood,* 941 F.2d 817 (decided in 1991).

However, this is a most general level of analysis. When these principles of law are applied to the facts of this particular case, it cannot be said that the law was clearly established. Due to the nature of the speech that was involved, the facts of this particular case could not fall within a murkier area of First Amendment jurisprudence. The Court itself had difficulty attempting to find the balance in this case between the school district's right to protect and maintain an educational environment suitable for elementary school children and the speaker's right to speak once the school had opened up the forum to certain forms of expression.

---

4. Whether or not a reasonable officer would have known that his or her conduct violated clearly established law is not a factual issue that can preclude summary judgment. *Id.* at 118, Rather, the question of whether an official is entitled to qualified immunity is a purely legal one. *Federal Deposit Ins. Corp. v. Henderson,* 940 F.2d 465, 477 (9th Cir.1991).

It would be inappropriate "to hold government officials to a higher level of knowledge and understanding of the legal landscape than the knowledge and understanding displayed by judges whose everyday business it is to decipher the meaning of judicial opinion." *Denno v. Sch. Bd. of Volusia County,* 218 F.3d 1267, 1274 (11th Cir.2000) (internal citation omitted). **Accordingly, the Court finds that the Individual Defendants are shielded by qualified immunity.**

IT IS ORDERED GRANTING IN PART AND DENYING IN PART the Defendants' Motion to Strike Notice of Supplemental Authority (doc. 58–1). The Notice of Supplemental Authority is allowed to the extent that the Court took notice of the cited authority. However, the Court does not consider argument presented after a case has been taken under advisement.

IT IS ORDERED GRANTING IN PART AND DENYING IN PART the Defendants' Motion for Summary Judgment (doc. 42–1). Judgment is entered in favor of all of the Defendants with respect to Counts Two and Seven (free exercise), Count Three (due process/vagueness), and Count Five (Establishment Clause) of the Plaintiffs' Complaint.

IT IS FURTHER ORDERED that the *Individual Defendants* are entitled to Summary Judgment with respect to the remaining causes of action in the Plaintiffs' Complaint on the grounds that they are entitled to qualified immunity.

IT IS ORDERED GRANTING IN PART AND DENYING IN PART the Plaintiffs' Motion for Summary Judgment (doc. 31–1). Judgment is entered in favor of the Plaintiffs with respect to Counts One and Six (freedom of speech) and

Count Four (Equal Protection Clause) of their Complaint.